Mary K. REYNOLDS
v.
UNITED STATES.
No. 313–55.

United States Court of Claims.
Jan. 15, 1958.

Robert D. Wallick, Washington, D. C., for plaintiff. Claude L. Dawson, Washington, D. C., was on the briefs.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

MADDEN, Judge.

The plaintiff brings this suit pursuant to a special Act of Congress which is quoted in finding 1.*   She alleges that

---

* 1. The plaintiff, Mary K. Reynolds, is the successor in interest to the Colonial Realty Company, and as such successor in interest, on August 9, 1955, instituted this action for damages pursuant to the terms of a special jurisdictional act, Private Law 858, 83d Cong., 2d sess., approved August 27, 1954 (68 Stat. A226), which reads as follows:

"An Act

"To confer jurisdiction upon the Court of Claims to hear, determine, and render judgment upon the claim of Mary K. Reynolds, as successor in interest to the Colonial Realty Company.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) notwithstanding any statute of limitation or lapse of time, any provision of law to the contrary, any release, or any prior acceptance by the claimant of partial performance by the United States, jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment upon the claim of Mary K. Reynolds, as successor in interest to the Colonial Realty Company, against the United States resulting from the alleged failure of the Secretary of the Interior to complete the exchange of lands authorized and directed by the Act entitled 'An Act providing for an exchange of lands between the Colonial Realty Company and the United States, and for other purposes', approved March 23, 1933 (48 Stat. 1295), as supplemented by the Act entitled 'An Act giving credit for water charges paid on damaged land', approved June 14, 1933 (48 Stat. 1300), in the manner and to the extent required by such Acts.

"(b) Jurisdiction is hereby conferred upon said court (1) to proceed as a court of equity jurisdiction in the adjustment of accounts between the claimant and the United States, (2) to enter such order or decree granting equitable relief as justice and right shall require, and (3) to enforce any such order or decree in any manner or by any proceeding available to a district court of the United

her predecessor in title, the Colonial Realty Company, had a right, under an earlier Act of Congress, the Act of March 23, 1933, 48 Stat. 1295, quoted in finding 2, to exchange, approximately acre for acre, 1,420 acres of land owned by it for more desirable lands owned by the Government, but that the Government wrongfully refused to accept some 230 acres of land tendered by Colonial, and to convey that acreage of the more desirable land to Colonial. The plaintiff seeks an accounting and damages for the alleged violation of the 1933 statute.

The Act of March 23, 1933, was passed to compensate Colonial for previous damage caused by the United States to Colonial, the nature or circumstances of which are not disclosed by the record. The Act provided that

> "upon execution and delivery by the Colonial Realty Company of a deed * * * to approximately one thousand four hundred and twenty acres of seeped and unproductive lands, as determined by the Secretary of the Interior,"

in certain named sections of land in the Klamath irrigation project in Oregon, the Secretary was directed to issue to Colonial a patent for an equivalent amount of acreage of public land on the Tule Lake Division of the Klamath project in Oregon-California, the latter lands to be selected by Colonial from lands still available in the stated location.

About October 11, 1933, Colonial sent to the Secretary of the Interior a petition requesting the conveyance to it of approximately 1,400 acres which it had selected in the Tule Lake Division, and listing 1,397.7 acres of land which it pro-posed to give in exchange. On October 31 it tendered to the Secretary a deed conveying the same lands listed in the petition, except for minor variations.

On February 12, 1934, the First Assistant Secretary of the Department of the Interior transmitted Colonial's deed and other papers to the Commissioner of the General Land Office, instructing him to record the deed and issue to Colonial the patent "providing no other objection is found to exist." On February 24 the Acting Director, Division of Investigations, requested the Commissioner to withhold the recording of the plaintiff's deed and the issuance of the Government's patent to the plaintiff, "pending an investigation." The recording and the patenting were withheld. An investigation of charges of fraud on the part of Colonial took place.

On September 19, 1935, the Secretary advised the Commissioner of the Bureau of Reclamation that he had dismissed the charges of fraud, and that the Commissioner was "authorized to proceed, in cooperation with the Office of the Solicitor, to a final disposition of the Colonial Realty Company matter in accordance with existing law and in the light of the best interest of the United States." In March of 1935, the Commissioner directed one W. W. Johnston, a Bureau of Reclamation economist, to examine the lands tendered by Colonial for exchange to determine how many acres of such lands, in each legal subdivision, were "temporarily or permanently unproductive." Johnston was told that his determination should be guided solely by the actual quality of the land, without reference to any existing or prior classification. At

States for the enforcement of its orders and decrees.

"Sec. 2. (a) Suit upon such claim may be instituted hereunder not later than one year after the date of enactment of this Act. Except as otherwise provided herein, proceedings for the determination of such claim, and review and payment or performance of any judgment, order, or decree thereon shall be had in the same manner as in the case of claims over which such court has jurisdiction under section 1491 of title 28 of the United States Code.

"(b) Payment of any judgment rendered hereunder for damages and compliance by the United States with any order or decree entered hereunder for equitable relief shall constitute a full and complete satisfaction of all claims and demands of the Colonial Realty Company, its successors and assigns, arising from the Acts cited in subsection 1(a) of this Act."

about the same time a similar set of instructions was sent to a Dr. W. L. Powers, who was the head of the Soils Department of Oregon State College and the experimental stations.

Mr. Johnston and Dr. Powers made separate investigations and reports. The basis of classification which Dr. Powers used is shown in finding 14.† On January 29, 1936, the Acting Commissioner of Reclamation sent to the Secretary a schedule of lands of Colonial regarded as eligible for exchange, that classification of them being based primarily on the report of Dr. Powers. The list of lands was then submitted to the Solicitor of the Department who rendered his opinion as to the title of Colonial to the lands which it proposed to exchange. A new deed had to be prepared for execution by Colonial. It conveyed 1,191.35 acres, all but a minor portion of the amount found by the Department to be acceptable, according to Dr. Powers' investigation. The United States on October 20, 1936 issued its patent to Colonial for 1,190 acres in the Tule Lake Division.

On April 7, 1941, counsel for Colonial wrote a letter and a brief, addressed to the Secretary, requesting reconsideration of the exchange of lands.

The plaintiff urges that the Act of 1933 required the Secretary of the Interior to accept Colonial's deed for 1,397.7 acres of land, tendered on October 31, 1933, and grant Colonial approximately that number of acres of Tule Lake land. She says that the Act of 1933, in using the expression "seeped and unproductive lands, as determined by the Secretary" referred to a determination made before the Act was passed, and not to a determination to be made in the future. The plaintiff's argument that there had been a determination before the Act was passed relies on a statement by the Commissioner of Reclamation which is quoted in S. Rept. 1159, 72d Cong., 2d Sess., with regard to Colonial's lands, that " * * * the lands, or the greater part of them, are not suitable for cultivation." We think this statement, made in a report to Congress as to the Department's attitude to the bill, was not the determination referred to in the bill as to what lands were "seeped and unproductive." If this statement was regarded by Congress as a constructive lump determination that all of Colonial's lands were seeped and unproductive, there would have been no point in saying, as the statute said, that if more than 50 percent of any legal subdivision of the land was unproductive, that entire legal subdivision should be exchangeable.

The plaintiff also argues that the grammar and context of the statute show that a prior determination was contemplated. We think the grammar and context point in the other direction. If they did not, Congress would have left the parties completely at large, since there was no prior determination.

The plaintiff argues that the Secretary, in February 1934, approved the exchange on the basis of the deed for 1,397.7 acres tendered by the plaintiff, and that he was

† 14. On April 27, 1935, Dr. Wilbur L. Powers submitted a comprehensive report to the Commissioner of Reclamation based upon his independent field study made by him from April 11 to 20, 1935 in which report he classified and appraised the various lands which Colonial Realty Company wished to exchange according to the classifications commonly used in the Bureau of Reclamation. In his explanation of the various classifications from class 1 to class 6, the report states as follows:

"Class 6 land is permanently unproductive or with very limited productiveness. Class 5 land is at least temporarily of low productiveness and in general is only suitable for pasturage under the present conditions. Classes 1 to 4 correspond to the classifications commonly used in the Reclamation Bureau. Class 4 is of limited productive value, due to poor drainage, rough topography, alkalinity, or other limiting factors. The reasons for placing lands in Class 3, as frequently shown on accompanying map, is shown by the small letter added after the number, as for example, '3t', indicating third class topography. Class 2 may be of moderately undulating topography or less productive than the best, smooth-lying lands included in Class 1."

arbitrary and wrong in thereafter refusing to complete the transaction on that basis. It will be remembered that the First Assistant Secretary did at that time send the pertinent papers to the Commissioner of the General Land Office directing him to record Colonial's deed and issue it a patent "providing no other objection is found to exist." No doubt the transaction would have been consummated on that basis if the Division of Investigations had not interposed a request for delay, pending an investigation for suspected fraud. As we have seen, the charges of fraud were ultimately dismissed by the Secretary.

During the delay, the Department apparently reconsidered the action which it had almost completed, and concluded that the statute did not direct a lump exchange of Colonial's land without a determination by the Secretary as to their quality. As we have indicated above, we think this reconsidered opinion was the correct one. The fact that the opportunity to reconsider was afforded fortuitously is immaterial. Until the transaction was consummated, the Government's officials had not only the right, but the duty to reconsider it.

The plaintiff says that, in any event, the Secretary's determination as to what lands were "seeped and unproductive" was wrong as to 127.4 acres of the 150.5 acres tendered by Colonial and not accepted for exchange. When the Secretary undertook to determine the quality of the lands, he requested two experts in soils to make separate investigations and reports. The two reports were not in agreement in all respects. The parties are in dispute as to which report was more favorable to the plaintiff's position. It is probably not possible, from the record, to resolve that dispute. In any event, the Secretary made his determination almost entirely on the basis of Dr. Powers' report.

We have no doubt that Congress, in imposing on the Secretary the duty to make the determination, contemplated that it would be made on the basis of investigations and reports by experts. The Department, in its Bureau of Reclamation, of course, relies heavily on experts with the training and experience of those used by the Secretary.

The Government urges that the determination by the Secretary, that function having been imposed upon him by the statute, was conclusive, if supported by substantial evidence. Since the Secretary's determination was, obviously, supported by substantial evidence, the Government says that the case ends there.

The plaintiff says that Congress would have been wasting its words, and would have known that it was doing so, if it had merely authorized the plaintiff to bring this suit, but had loaded her with the impossible burden of persuading the court that the testimony of a recognized expert was not substantial. We are inclined to agree with the plaintiff. However, since the case has been tried *de novo* in this court, and we have the materials for deciding it without regard to presumptions or conclusiveness of administrative action, we need not decide the point raised by the Government.

We now consider the question whether 127.4 acres of the lands tendered by Colonial and not accepted by the Government, which lands the plaintiff contends were seeped and unproductive, were so, within the meaning of the 1933 Act. One of the plaintiff's contentions is that the Secretary did not follow the statutory provision that if more than 50 percent of the acreage of a legal subdivision was seeped and unproductive, the whole of the subdivision should be regarded as exchangeable. The question here is what Congress regarded as a legal subdivision. The plaintiff urges that a 40 acre tract, a quarter of a quarter section, is the smallest subdivision contemplated by the statute. In Government surveys of the land which had been made before the enactment of the statute, there were odd shaped tracts bounded on one or more sides by irrigation ditch or railroad rights of way or easements, or other irregular boundaries. These boundaries did not, of course, coincide with regular survey lines. The

irregular shaped areas were designated on the surveys as "lots." The 1933 statute mentioned the fact that the "lots" did not correspond with legal subdivisions, in stating that, in order to avoid the expense of surveys to determine the exact acreage of the lots, the exchange might be made on the basis of approximate acreage. It then contains the proviso that "should any legal subdivision of the lands herein described consist of more than 50 per centum of unproductive land the whole subdivision" is exchangeable. The language in its context indicates that the plaintiff's interpretation is correct, and that the Government should have accepted the remaining 7.4 acres in the SE¼SE¼ of Section 21, as "constructively" seeped and unproductive.

We must determine whether the remaining acres in controversy were actually seeped and unproductive within the meaning of the 1933 statute. As we have said, we think Congress intended that the determination as to the quality of the lands should be made on an expert scientific basis which could be uniformly applied to a large number of tracts in various locations. The plaintiff's witnesses in the trial before a commissioner of this court were a county farm assessor, a farmer, a rancher, a graduate agricultural engineer who was currently a real estate broker, and another real estate man with considerable appraisal experience. The Government's witnesses were the two experts who had made the investigations and reports to the Secretary in 1935, Mr. Johnston and Dr. Powers.

We think the testimony of the plaintiff's witnesses is not very helpful. According to the Bureau of Reclamation's system, land was graded in six classes, No. 1 being the best, Nos. 1 to 4 being regarded as productive, and Nos. 5 and 6 unproductive. The distinction between any two adjacent classes, such as 4 and 5 would be by no means obvious, and could hardly be made by a passerby, or even a neighbor, or any other outside observer. In passing through any countryside one will see productive farms, and an occasional unused tract grown over with brush and wild grasses and weeds. Presumably its soil has the same natural content as that of the neighboring farms. Perhaps none of them had very good natural soil, but the others have been built up by cultivation. At any rate, the class in which its soil would fall, as to whether it just made or just missed class 4 in a scientific classification, would be a problem for an expert and not for a lay observer.

The defendant's expert, Dr. Powers, had unusual qualifications and experience for the investigation which he was requested to make. He carried and used an auger to take samples of the soil and a testing kit to analyze the samples. The results so obtained seem to us to be as objective as could possibly be hoped for.

■ The defendant's other expert, Mr. Johnston, disagreed with Dr. Powers as to 51.1 acres of the land here in question. Their reports made in 1935 had similarly disagreed. As between the two experts, we think that Dr. Powers was somewhat better qualified, and that his investigation was more thorough than that of Mr. Johnston. Our conclusion is that none of the land which the Secretary refused to accept for exchange was, in fact, seeped and unproductive within the meaning of the statute.

As we have said above, there were 7.4 acres which, although not unproductive, should have been accepted because the legal subdivision in which they lay was more than 50 percent unproductive.

■ The plaintiff seeks to recover the difference in rental value of the land which Colonial ultimately conveyed to the Government, and the more valuable land which the Government patented to Colonial, for the period during which completion of the exchange was delayed. She computes this difference to be $35,700. She says that the fraud investigation, and the consideration and determination of the quality of the lands were unjustified. As to the fraud investigation, all that we know is that there was an investigation, and that the charges of fraud were ultimately dismissed. As to wheth-

er there was probable cause for the investigation, we do not know. We have no basis for a determination that the investigation was not justified.

As to the delay resulting from the investigation and determination of the quality of the land, the Secretary had the legal duty to make that determination. The plaintiff is not entitled to recover for delay in the completion of the exchange.

■ The plaintiff demands as her damages (1) the difference in the sales price in 1936 between the lands offered in exchange and the Tule Lake lands which she should have been given by the Government in exchange; (2) the loss in rental value by reason of not having had ownership of the Tule Lake lands from 1933 to 1957; (3) perhaps as an alternative to (2) the difference in the sales prices of the lands in 1957, due largely to the decrease in the value of the dollar, and (4) the loss of water credits on the lands which should have been made, but were not accepted in exchange.

■ The plaintiff is entitled to the difference in the sales prices of the respective lands in 1936. For the 7.4 acres which we have found should have been accepted, that difference is $565. She is not entitled to the difference in rental value of the lands for the 1933–1957 period. The normal measure of damages for breach of contract or other legal obligation is the difference in value between what one would have received if the obligation had been satisfied according to its terms, and what one got or had in fact. The time when performance should have taken place is the time as of which damages are measured. One cannot recover that difference, and in addition the loss which has occurred thereafter as a consequence of the breach of the obligation.

■ The plaintiff is not entitled to recover the difference in the sale prices of the two kinds of land in 1957. It is true that if specific performance had been feasible, and if the court had concluded that, in the circumstances, it would have been equitable to grant it, the plaintiff would have had the benefit of the increase in value. But specific performance not being granted, and there having been the same remedy at law available to this plaintiff as to any other person who has a claim founded upon an Act of Congress, there is no reason to apply an extraordinary rule of damages.

■ The plaintiff claims and is entitled, under the companion Act of June 14, 1933, 48 Stat. 1300, to loss of water credits on the lands (7.4 acres) which should have been, but were not, accepted for exchange. That loss is $135.05.

■ The plaintiff claims interest. Claimants against the United States are not entitled to interest unless it is provided by statute or by contract. 28 U.S.C. § 2516, 62 Stat. 978; United States v. Goltra, 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776; United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521.

The plaintiff may have a judgment for $700.05.

It is so ordered.

REED, Justice (Retired), sitting by designation, JONES, Chief Judge, and WHITAKER and LITTLETON, Judges, concur.