**Joseph A. WHITE, Jr., et al.**

v.

**The UNITED STATES.**

**No. 32–66.**

United States Court of Claims.

May 16, 1969.

Alfred A. Affinito, Pittsburg, Cal., attorney of record for plaintiffs.

Howard O. Sigmond, Washington, D. C., with whom was Acting Asst. Atty. Gen., Glen E. Taylor, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

NICHOLS, Judge.*

This case involves an alleged breach by the defendant of a contract in which the defendant agreed to sell certain surplus realty to the plaintiffs.

It is our opinion that the plaintiffs are entitled to recover, since the evidence in the record clearly shows that the defendant breached the contract between the parties. The court has a difficult problem, however, in connection with the determination of the amount due the plaintiffs because of the defendant's wrongful action.

The realty involved in the present case consists of two parcels of land which formerly were part of the Camp Stoneman Military Reservation in Pittsburg, California. Camp Stoneman was declared surplus to the needs of the United States sometime prior to 1960, and procedures to provide for the disposal of the surplus property were initiated by the defendant's General Services Admin-

* We are indebted to Trial Commissioner Mastin G. White for his memorandum opinion and findings of fact. We agree with the former and adopt the latter with minor revisions. We consider that preparation of an opinion of normal scope is necessary to explain fully the reasons for our decision and to prevent future misapplication of it as a precedent. We have borrowed extensively from the commissioner's memorandum opinion.

istration (GSA). Under the disposal plan prepared by the GSA, certain lands within the main cantonment portion of Camp Stoneman were set aside for conveyance to local governmental bodies as sites for schools, parks, and arterial streets; and the remainder of the Camp Stoneman area was divided into parcels for the purpose of sale. The municipal zoning contemplated that parts of the area would be used for heavy industry, controlled manufacture, and business. Part would be residential.

Two of the Camp Stoneman surplus parcels were designated as M–1 and M–2. They are contiguous and together form an area that resembles a modified right-angle triangle, with a south side extending approximately 3,200 feet from west to east, an east side extending approximately 1,200 feet from south to north, and a hypotenuse which extends approximately 3,000 feet from northeast to southwest but fails to meet the south side of the "triangle," so that there is actually a small, curved west side of the area. The area is bounded on the south side by a limited-access freeway maintained by the State of California, on the east side by private property, and on the north side (i. e., the hypothenuse) by a public street that is known as California Boulevard. See the plans appended to this opinion and made a part thereof.

Parcel M–1 contains 11 acres and is located in the western portion of the triangular area previously mentioned. Parcel M–2 contains 40.9 acres and occupies the eastern portion of the triangular area.

Parcels M–1 and M–2 are located outside the main cantonment portion of Camp Stoneman, and they are separated from the main cantonment portion by the limited-access freeway previously mentioned. The freeway bounds parcels M–1 and M–2 on the south and bounds the main cantonment on the north. Parcels M–1 and M–2 do not have access to the freeway.

Parcels M–1 and M–2 are zoned for heavy industry by the City of Pittsburg. They are the only parcels with such a zoning among the many parcels into which Camp Stoneman was divided.

Two sets of railroad tracks are located on parcels M–1 and M–2. They connect with the main line of the Southern Pacific, north of the parcels. The tracks run along most of the north boundary of the two parcels and are near California Boulevard. The tracks are located approximately 40 feet apart at the western end of parcel M–1, and they run parallel to a point near the eastern boundary of parcel M–2, where they converge into one track. The two sets of tracks and the area between them cover a strip of land approximately 79 feet wide on the north side of parcels M–1 and M–2. The tracks were used by the Southern Pacific Company to provide transportation services for Camp Stoneman when it was an active military installation, and they connect with various spurs and sidings spreading out in the cantonment area south of the freeway, which they cross by a bridge.

At the time when parcels M–1 and M–2 were offered for sale by the GSA, no crossing of the railroad tracks on the parcels had been established, and the tracks effectively separated the remainder of the two parcels from California Boulevard.

A contract was entered into between the defendant (represented by the GSA) and the plaintiffs on June 8, 1962, under which the defendant agreed to sell and the plaintiffs agreed to buy parcels M–1 and M–2 for a price of $140,000. A third parcel, designated as M–4, was also included in the contract. Parcel M–4 is a relatively small and irregularly shaped parcel lying to the east of the northeast corner of parcel M–2. The parties have treated parcel M–4 as being without significance in connection with the present litigation. With respect to the two sets of railroad tracks on parcels M–1 and M–2, the contract provided in pertinent part as follows:

*Railroad Easement:* There is reserved and excepted from this sale the existing trackage identified as "A", "I" * * on the plat attached to the Bid Invita-

tion together with easements therefore [sic] 20 feet wide for railroad and transportation purposes upon, along, over and across parcels M–1, M–2 * * *.

It will be noted that the defendant contracted on June 8, 1962 to sell parcels M–1 and M–2 to the plaintiffs subject to two 20-foot railroad easements for the two sets of existing railroad tracks on the parcels. However, three months earlier, on March 8, 1962, the defendant had entered into a contract with the Southern Pacific Company whereby the defendant agreed to sell and the SP agreed to buy the existing trackage on parcels M–1 and M–2, together with a railroad easement 79 feet wide covering the two sets of tracks and also the area between the two sets of tracks. Thus, the "Railroad Easement" provisions of the contract between the defendant and the plaintiffs, on the one hand, and the contract between the defendant and the Southern Pacific Company, on the other hand, were inconsistent in so far as parcels M–1 and M–2 were concerned. The evidence in the record warrants the inference that this mix-up was due to faulty coordination among the personnel of the GSA, rather than to intentional wrongdoing by anyone. The defendant was faced with the necessity of breaching one of the contracts, and elected to breach the contract with the plaintiffs. The railroad contract was the earlier and defendant claims that the conflict between it and the plaintiffs was an inadvertence the plaintiffs should have discovered. We do not agree with this. Pikesville Home Builders, Inc. v. United States, 160 Ct.Cl. 541 (1963).

A quitclaim deed conveying parcels M–1 and M–2 to the plaintiffs was prepared by the GSA on June 22, 1962. The quitclaim deed stated with respect to parcels M–1 and M–2 that there was reserved to the defendant, it successors and assigns, an easement for railroad and transportation purposes over a strip of land 79 feet wide running along the north side of the parcels and containing the two sets of existing railroad tracks, together with the area between the two sets of tracks.

The quitclaim deed mentioned in the preceding paragraph was delivered by the GSA to the plaintiffs' escrow agent, Western Title Guaranty Company, on August 8, 1962, with closing instructions. The title transaction was closed and the purchase price was paid to the GSA on September 2, 1962. The deed was recorded by the Western Title Guaranty Company on September 21, 1962. It was forwarded to the plaintiffs by the escrow agent approximately one month later.

Prior to the receipt of the quitclaim deed from their escrow agent, the plaintiffs themselves did not see the deed or receive any actual notice regarding the variance between the description in the deed of the railroad easement on parcels M–1 and M–2, on the one hand, and the "Railroad Easement" provision contained in the contract between the plaintiffs and the defendant, on the other hand.

As a result of the defendant's breach of contract, the narrow strip of land between the two sets of railroad tracks on parcels M–1 and M–2, comprising a total area of 2.6 acres, was conveyed to the plaintiffs subject to a railroad easement, whereas the defendant had agreed in the contract between the parties to convey this narrow strip of land to the plaintiffs free of any railroad easement. Neither side introduced any evidence at the trial with respect to the difference as of September 1962 between the fair market value of the 2.6 acres subject to the railroad easement and the fair market value that the 2.6 acres would have had free of any railroad easement. The lack of such evidence is not surprising, however, since the narrow strip of land between the two sets of railroad tracks probably did not constitute salable acreage as of September 1962, separate and apart from other portions of parcels M–1 and M–2.

It has been said that, owing to the good faith blunders of its agents, defendant was in a position where its contracts with the plaintiffs and with the Southern Pacific Railroad were inconsistent

and it had to breach one or the other. It elected to breach the contract with plaintiffs. It has not yet performed the contract with the Railroad owing to a title difficulty involving other land. It appears, however, that the Railroad is the equitable owner of a 79 foot easement over the plaintiffs' land and doubtless it has a right to receive a deed confirming its title on demand. The Railroad asked to be sold the 79 foot easement to fulfill a plan it had to construct two additional tracks along the strip between the two that were already there, making four in all. Defendant has treated the Railroad as owner of its easement in dealings with plaintiffs, as in referring them to the Railroad to discuss crossings over the tracks, and this seems proper. As to plaintiffs, the breach is irrevocable and the only serious issue is the measure of damages.

The plaintiffs attempted to show that the GSA representative, Mr. Prendergast, promised the plaintiff, Joseph A. White, Jr., before the award, that the plaintiffs would have access to parcels M–1 and M–2 from any point along California Boulevard. Our Finding is (Finding 16–d) that the representative did state that the purchaser of the parcels would have access to California Boulevard and that there would be no problem in obtaining access. The plaintiffs have not taken exception to this Finding. We do not read it as meaning that Mr. Prendergast said the access would be anywhere along California Boulevard or at an unlimited number of points. The evidence does not indicate that the plaintiffs have been denied anything Mr. Prendergast is found to have promised. Accordingly, it is unnecessary to consider whether an oral promise by him could possibly bind the defendant.

This underbrush eliminated, there stands clearly before us the great controverted fact issue in the case. Plaintiffs were promised a fee title subject to an easement for 2 tracks. The defendant gave them such a title subject to an easement for 4 tracks. The fact question that remains is what difference, if any,

exists between the fair market value of the property subject to these two different easements. In light of the amount of the plaintiff's claim the award recommended by our commissioner, which we confirm $7,300, reflects a finding that the difference in the two values is relatively slight because the difference in the burdens on the servient tenement as between the two easements is likewise slight. The plaintiffs say the differences are great, but we do not agree.

The 2 existing tracks running over plaintiffs' land to the area South of the freeway constitute what the Southern Pacific Railroad calls a "drill track." One plan in evidence calls one a "drill track," the other a "storage track." On the other side of the freeway the lines branch out as stated above into various spurs which served Camp Stoneman when it was a military cantonment, and are intended in the future to serve the manufacturing and other business the GSA has located, and expects in future to locate, in the area, under the City's zoning. A drill track is in general a sort of main road to provide rail service from the main line to an area where customers of the railroad are located. At the time of trial, only 3 industries were actually operational across the freeway, so the use of the drill track did not reach its potential. The track on plaintiffs' premises was also largely used for car storage.

The Railroad had no immediate plans for utilizing the easement for 2 additional tracks it had contracted to purchase from the Government. This would be done when the need arose. Meanwhile, it is clear that the use of the 2 tracks was, volume aside, substantially the same as the use of the 4 tracks would be when the additional 2 were put in place.

The plaintiffs intended, and we have found, that they would divide parcels M–1 and M–2 into lots of approximately 5 acres each, except for 1 which was larger but less usable. All 10 would extend from north to south with frontage both on California Boulevard and on the freeway. They would be sold for industrial uses. Plaintiffs said they intended

to provide each pair of lots with an access road running across the tracks and then along the boundary between the two members of the pair. They meant that these crossings would be "private," that is, not dedicated as streets to public use, and therefore that no expensive safety devices such as automatic lights and gates would or could be required. There would thus be 5 crossings, all without safety devices and at approximately even distances. Plaintiffs seemed to think that there was nothing about this that was incompatible with the Railroad's use. Plaintiffs except to our Finding 16–e, which is to the contrary. Plaintiffs stated at times a lower aggregate number of crossings was all they required, but the record does not show just where they would be.

We will note at the outset that according to uncontradicted testimony the private crossings of the kind contemplated are normally revocable by the Railroad at will on 30 days notice. Plaintiffs hardly could have expected that 10 major industrial firms would make large investments in plant facilities with no access to them provided not revocable on 30 days notice. The Railroad recognized that any crossing rights it granted could not be revocable. Presumably, however, an attempt by the Railroad to revoke a private crossing right it had previously approved would be a matter for the Commission under the statute to be quoted below.

Plaintiffs believe that under the California Public Utilities Code, Section 7537, they would somehow have had a legal right to these 5 or 4 or 3 private crossings, in case of a 2 track easement, but somehow lose that right by reason of the creation of a 4 track easement. The Statute in question reads as follows (West's Ann.Pub.Util. Code § 7537):

*Farm And Private Crossings; Construction And Maintenance; Authority Of Commission.* The owner of any lands along or through which any railroad is constructed or maintained, may have such farm or private crossings over the railroad and railroad right of way as are reasonably necessary or convenient for ingress to or egress from such lands, or in order to connect such lands with other adjacent lands of the owner. The owner or operator of the railroad shall construct and at all times maintain such farm or private crossing in a good, safe, and passable condition. The commission shall have the authority to determine the necessity for any crossing and the place, manner, and conditions under which the crossing shall be constructed and maintained, and shall fix and assess the cost and expense thereof. (Stats. 1951, c. 764, p. 2181, § 7537.)

Without inquiring into plaintiffs' legal proposition in detail, it suffices to point out the following:

a. The statute does not distinguish between 2 and 4 track lines.

b. By its own terms the crossing right is limited to what is reasonably necessary and convenient. The California decisions indicate that unreasonable demands cannot be made on railroads under this section. The rights of a private crossing owner are always subordinate to the reasonable operating necessities of the railroad. Matoza v. Southern Pacific Co., 59 Cal.App. 636, 211 P. 252 (1922).

c. Contrary to plaintiffs' belief, according to the record, a crossing being private does not of itself eliminate the necessity for safety devices. This depends on the character of the traffic, both rail and highway. There is evidence that the Railroad, with commission support expected, would have considered installation of safety devices necessary on any crossings over its tracks to plaintiffs' land, whether such crossings were private or public.

d. Apparently a private crossing can be established by agreement with-

out action of the commission, and the role of the commission is somewhat that of an umpire. In case of a disagreement, before the commission, the views of the railroad as to its operating needs would be of great importance. Defendant's witness Lippow testified that railroads have "tremendous rights" in this area and are "pretty powerful", meaning, we suppose, that they are not easily forced, through these statutory proceedings or otherwise, to open up crossings, private or otherwise, if incompatible with their operating needs.

e. There were various estimates of the cost of private crossings with safety devices. Our commissioner, in Finding 34–c, determined that cost of 5 crossings with safety devices would have been $99,000, a figure not taken into account by plaintiffs.

f. The Railroad refused to agree to even a single private crossing, where plaintiffs want it, and the plaintiffs did not invoke the statutory procedure by appealing to the commission, their reason apparently being that they thought they had to reduce the easement to 2 tracks before an appeal would have a chance, and for the further reason that the Railroad did not yet own the tracks. What the commission would have done is, therefore, naturally in the realm of speculation, at least so far as concerns the record in this case. There is no adequate showing as to why the extra 2 tracks made all that much difference in plaintiffs' statutory rights.

g. Mr. Dado, the only representative of the Southern Pacific to testify, said that the Railroad's Operating Department had decided "regardless of whether the other 2 tracks go in it is not feasible to put a private crossing there over those 2 tracks." The reason was the complexity of switching cars into the area for storage, if the private crossings had to be left unobstructed, and the prolonged blocking of the crossings that would probably occur. Moreover, there would be "a very dangerous crossing condition for use of a crossing" the reason being that "it is blinded by the parking of cars adjacent * * Railroad cars." The cars parked for storage would make it difficult for a person coming from parcels M–1 and M–2 "to see what was coming down the track." Our commissioner's conclusion in Finding 16–e that the plaintiffs expectation was unreasonable with respect to the 2 track operation and incompatible with that operation appears to us to be supported by substantial evidence. It is indeed difficult to believe that responsible industrial concerns would be willing to require their employees to travel to and from work over such dangerous crossings.

Plaintiffs, however, insisted and still insist that except for the 2 extra tracks planned for, and provided for in the easement, there would have been no problem about obtaining the private crossings they needed. The basis for this belief is that the representatives of the Railroad, when refusing the first of the proposed crossings, the one requested for Stanley Steel Strapping Co. (Finding 23–e), reportedly stated that the reason for refusing the crossing was that it would interfere with the plans to construct 2 additional sets of tracks and to use the area of the easement as a storage yard. This was, however, as to the 2 track easement, a negative inference of a somewhat tenuous kind, which would have been dissipated by an inquiry of Mr. Dado, if he was telling the truth at the trial. The 4 track easement was the legal reality so far as the Railroad was concerned and any talk about · the 2 track easement would have been a subjunctive contrary to fact. It is, therefore, natural that they framed their

statements in terms of the 4 track situation. It may be that someone was not being overzealous for the plaintiffs' enlightenment inasmuch as plaintiffs were trying in court to limit the easement to 2 tracks, through the Court of Appeals, (White v. Administrator of GSA, 343 F.2d 444 (9th Cir. 1965)), apparently without anyone ever bothering to tell them that such reformation of the deed would be futile for their purposes. However, this was before our commissioner and he still elected to believe that the proposed private crossings would have been unacceptable with a 2 track easement. His determination is not so plainly erroneous as to be subject to overturning under Rule 66. Mr. Dado was before the trial commissioner who had every opportunity to evaluate his credibility and evidently rated it high. Simply from the common sense of the thing it would appear that for a given volume of Railroad business on the tracks, the 2 track set-up might often have been more dangerous than the 4 track set-up.

Plaintiffs compute that the profits they would have derived from these speculations in real estate will be practically wiped out by the costly arrangement which is the only one the Railroad will agree to for access to industrial plants on parcels M-1 and M-2. This is to have crossings, with the proposed safety devices, near the 2 east and west extremities of plaintiffs' land, whether public or private crossings, the Railroad does not care. From these 2 crossings, and connecting them to the proposed industrial plants, plaintiffs would have to construct a road along the boundaries to the west, south and east. The court has prepared from the exhibits and testimony plans which will illustrate the differences between plaintiffs' and the Railroad's development projects. Regrettable as it is, we cannot see any proof in the record that plaintiffs could have achieved access in any cheaper manner in the event they had received title burdened only with the 2 track easement according to their contract. They did not offer any

evidence of the probable cost of any development scheme that met the Railroad views part way, nor was there any evidence that any compromise between their wish and the Railroad's was a practical possibility. It follows that the only thing the plaintiffs have proved they lost by the breach of contract is the narrow strip between the existing tracks which will be occupied by the new tracks if they are built as planned, the record being silent as to any use the plaintiffs could have put this strip to. Tested by this standard the proposed award of $7,300 does not seem unreasonably small.

The normal measure of damages for partial breach of a contract to convey real estate is the difference between the value of what was conveyed and what should have been. Reynolds v. United States, 141 Ct.Cl. 211, 158 F.Supp. 719 (1958). Since the parties have discussed Pikesville Home Builders v. United States, *supra*, we close by stating we have considered this case and it is not in point, except on the proposition for which it is cited above. Plaintiff there, bid on an offer of surplus Government land represented to front on a named thoroughfare. Unknown to it, the thoroughfare was of the then unfamiliar limited access type and the normal right of access had been deeded away. The General Conditions allowed the buyer to withdraw and recover his deposit if the title was found not marketable. We held it was not marketable for the uses for which plaintiff intended it because of the lack of access. Here the defendant offered the property "as is," "where is," with no guaranty or warranty of marketability whatever. It follows that lack of access was not a breach of itself and plaintiffs' damages are limited to those directly related to the difference between the interest the defendant contracted to convey, and what it did convey.

Accordingly, judgment is entered for the plaintiffs in the sum of $7,300.

APPENDIX

R. R. Crossings Proposed
by So. Pacific for
Access to M-1 & M-2

(map prepared by Court from Exhibits & testimony Submitted by the Parties)

CALIFORNIA BOULEVARD (COUNTY ROAD)

Pitlock Property

1208.21'

No line of main So. Pac.

Railroad Easement

County Easement

Proposed Industrial Roadway

State Highway *

* no access from roadway

Proposed tracks
Railroad tracks
Proposed Crossings & Access Road