See also 8 Cl.Ct. 470.

**NORTHERN PAIUTE NATION et al.**

v.

**The UNITED STATES.**

No. 87–A.

United States Claims Court.

March 26, 1986.

I.S. Weissbrodt, Washington, D.C., attorney of record for plaintiff. Abe W. Weissbrodt and Richmond F. Allan, Duncan, Weinberg & Miller, of counsel.

Daniel G. Steele, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, attorney of record for defendant.

### OPINION

LYDON, Judge:

This Indian Claims case is again before the court, this time on plaintiff's Motion for Determination of Issues of Law and defendant's response thereto relating to one particular claim, i.e., the irrigation system claim. The facts are set forth fully in an earlier opinion discussing this particular claim, 8 Cl.Ct. 470 (1985), but, for purposes of confronting the instant motion, can be stated quite simply.[1] Basically, defendant

---

**1.** The earlier opinion denied defendant's motion for summary judgment, holding that the claim (irrigation system claim) asserted was tribal, as opposed to individual, in nature. The parties

obligated itself in 1906 to construct an irrigation system capable of irrigating some 10,000 acres of land as part of an agreement for the Tribe's cession of about 268,000 acres of the then total 320,000 acre reservation. The Tribe ceded the land, but defendant never furnished the entire promised system, although some steps were taken toward that end.[2] It was determined, in the earlier opinion, that the government breached this agreement by not completing the entire irrigation system within a reasonable period of time after 1906. The question presented here is the proper method of measuring plaintiff's damages arising from this breach.

Plaintiff contends that it is entitled to the following elements of damages: (1) "the amount of the present cost of completing an irrigation system capable of developing and delivering water properly to irrigate 10,000 acres";[3] and (2) "the business opportunity lost by not having had the system as a tribal asset from the time the system ought to have been provided to the present," otherwise referred to as "net profits."[4] Defendant responds that damages should be measured as of the time of breach and that plaintiff's second element of damages, i.e., lost profits, should be denied in full. Upon a review of the submissions of the parties and after oral argument, the court concludes that defendant's position must be sustained.

### I.

Plaintiff's first element of damages attempts to recover the present day cost of

providing the Tribe with the promised irrigation system. The parties agree that the arrangement between the Tribe and defendant was contractual in nature. The parties also agree that defendant had a reasonable time after 1906 in which to construct the irrigation system, notwithstanding the failure to set a time frame in the agreement, see, e.g., B-E-C-K Constructors v. United States, 215 Ct.Cl. 793, 801, 571 F.2d 25, 31 (1978), and that defendant's failure to do so constituted a material breach. Plaintiff maintains, however, that the passage of time *simpliciter* did not extinguish the government's obligation, which, it argues, "continues to this day." Plaintiff contends that the material breach of the agreement gave it, in the absence of a repudiation by defendant, the choice as between ending the agreement and suing defendant for total damages and continuing the agreement. Plaintiff thus argues it had a right to hold the government to full performance while saving to itself a future claim for partial damages (breach). In plaintiff's view, it is only its present election "to commute its right to performance to recovery of damages" that terminates defendant's obligation to perform.

In support of its position, plaintiff relies on a series of Court of Claims decisions commonly referred to as the *Helex* cases.[5] Plaintiffs in those cases were producers of Natural Gas Helium with fixed longterm contracts, i.e., greater than 20 years, to deliver helium gas to the government. Due to changed economic circumstances

---

had intimated to the court that resolution of that issue made the likelihood of settlement probable. *See* 8 Cl.Ct. 489 n. 16. Needless to say, that likelihood did not come to fruition. The parties have made similar intimations regarding the issues dealt with in this opinion. The court sincerely hopes that the process will be more productive this time as the court has no intention of dealing with the issues presented by this particular claim in a piecemeal fashion.

2. It presently appears that approximately 2,800 acres are irrigable by the system constructed by defendant.

3. Plaintiff agrees that the 2,800 acres presently serviced by an irrigation system are to be taken

into account in fixing damages under its damage theory.

4. Plaintiff disavows that it is seeking, in the instant action, damages for loss of productivity of the land itself due to the lack of an irrigation system. (*See, e.g.,* Pl.'s Reply Brief p. 13, n. 1).

5. *Northern Helex Co. v. United States,* 197 Ct.Cl. 118, 455 F.2d 546 (1972); *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707 (1975), *cert. denied,* 429 U.S. 866 (1976); *Cities Service Helex v. United States,* 211 Ct.Cl. 222, 543 F.2d 1306 (1976); *Northern Helex Co. v. United States,* 225 Ct.Cl. 194, 634 F.2d 557 (1980).

that developed during performance of the contracts, namely an unexpected drop in the price of helium, the government ceased making the payments called for by the contracts. The *Helex* cases held that the government's failure to pay was a material breach that gave plaintiffs the right, if they elected, to terminate the contracts, but which did not itself terminate them—

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach. [*Cities Service Helex v. United States*, 211 Ct.Cl. 222, 234–35, 543 F.2d 1306, 1313 (1972) (citations and footnote omitted).]

While the above statement from *Cities Service Helex* opinion is unquestionably true as a matter of contract law, the court does not believe it can be applied to the circumstances of the instant case in the manner advocated by plaintiff. Factually, the case at bar is different from the *Helex* cases. In those cases, the government's breach occurred during the course of plaintiffs' performance of the contract, *viz.*, both parties had continuing obligations. In such a situation, it is reasonable, and correct, for the aggrieved party to have the choice as between continuing and terminating the agreement. Here, by contrast, plaintiff had done all that was required of it under the agreement when it ceded the land; the only executory "obligation" outstanding after that time was that of the government to construct the irrigation system. Accordingly, the court is of the opinion that it is not correct to treat the contract here as continuing in the manner contemplated by the *Helex* holding.

The major problem with plaintiff's approach is its apparent premise that a contractual obligation continues indefinitely, notwithstanding a material breach thereof, until performance, repudiation or institution of a suit for total breach. This simply is not the law. Although an aggrieved party can, generally, await and insist on performance by the breaching party, the latter's obligation does not continue indefinitely. The breach gives rise to a cause of action, which, for example, if not acted upon within the period provided by the relevant statute of limitations, eventually becomes legally unenforceable.[6] *See, e.g., Twin Lakes Reservoir and Coal Co. v. Bond*, 156 Colo. 433, 399 P.2d 793, 796 (1965); *Lituchy v. Guinan Lithographic Co.*, 60 A.D.2d 622, 400 N.Y.S.2d 158, 159 (1977). Here, the material breach occurred when the government failed to provide the irrigation system within a reasonable time after 1906.

It is generally accepted, however, that Indian Tribes were not *sui juris, i.e.,* able to sue defendant, until passage of the Indi-

**6.** Plaintiff's reliance on *Riess v. Murchison,* 503 F.2d 999 (9th Cir.1974), *cert. denied,* 420 U.S. 993, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975), is misplaced. That case involved a convoluted California land sale contract. Any holding derived from that case is controlled by the particular facts stated therein. In the *Riess* case, the contract had only been partially breached at the time the suit was commenced, whereas in the case at bar the agreement had been totally breached long before suit was instituted. *See* 503 F.2d at 1010. Further, in the *Riess* case, the buyers, under a 1956 agreement, did not perform as promised in said agreement by June 28, 1958, resulting in an October 8, 1958 lawsuit relative to said breach; whereas in the case at bar, the 1906 agreement was materially breached within a reasonable period after 1906 and suit was not instituted until 1951 with plaintiff allegedly electing to consider the agreement breached sometime in 1980. There is no evidence that plaintiff insisted on total performance from defendant during the period 1906—1951 (*see* n. 10, *infra*), and there is some evidence defendant repudiated the agreement long before suit was instituted (*see* discussion in text, *infra*). *Compare* 503 F.2d at 1008.

an Claims Commission Act of 1946, 25 U.S.C. § 70 *et seq.,* 60 Stat. 1049. *See* F. Cohen, *Handbook of Federal Indian Law* 320–22 n. 321 (1982 ed.), *citing Choctaw & Chickasaw Nations v. United States,* 75 Ct.Cl. 494 (1932). However, Indian Tribes could and did obtain special jurisdictional acts to sue the government for breaches of agreements. *See, e.g., Sioux Tribe v. United States,* 89 Ct.Cl. 31 (1939). *See generally* G. Wilkinson, *Indian Tribal Claims Before the Court of Claims,* 55 Geo.L.J. 511 (1966). The Indian Claims Commission Act of 1946 (the Act) enabled Indian Tribes to sue the government without any special jurisdictional act. In making it clear that Indian tribes were empowered to sue the United States on a basis at least equal to that of other plaintiffs, Congress waived the defenses of statute of limitations and laches when it passed the Act. Act § 2, 25 U.S.C. § 70a. Congress also provided, however, that—

> The [Indian Claims] Commission shall receive claims for a period of five years after August 13, 1946, and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress. [Act § 12, 25 U.S.C. § 70k.]

Congress passed the Indian Claims Commission Act with the purpose of allowing Indian Tribes to have their claims of old considered. The Indian Claims Commission was created to serve as the administrative tribunal in this regard. The Commission entertained many Indian tribal claims from 1950 until its demise in 1978. As far as the court can determine, the Commission never recognized efforts, such as plaintiff presents herein, to measure damages for past wrongs at future dates. Moreover, plaintiff's assertion that it made its "election" to sue on the breach sometime in 1980 suggests that its present asserted claim

may be perceived as not arising until after August 14, 1946 and thus as not within the purview of the Act and accordingly beyond the jurisdiction of the court. *See* 25 U.S.C. § 70k; *McGhee ex rel. Creek Nation East of the Mississippi v. United States,* 194 Ct.Cl. 86, 92, 437 F.2d 995, 998–99 (1971) (claim "separate and apart from that outlined in the original petition" is barred if not timely filed).[7]

Plaintiff's claim based on breach of the 1906 agreement was given new life by the Act. Count IV of its petition (complaint) contains the "bare bones" of its irrigation system claim. There is no assertion therein of an election to sue for breach rather than insist on performance, nor is there an intimation in the petition of a claim for 1985—1986 damages relative to a 1906 or thereabouts breach of agreement.

Plaintiff's assertion that the Tribe continued to request over the years that the 1906 obligation of the government to supply an irrigation system covering 10,000 acres be fulfilled lacks record support. With one exception, the supplemental materials submitted by plaintiff do not appear to make any reference to the government's obligation under the agreement. Rather, they seem to be somewhat typical of the sorts of material documenting government sponsored projects to assist Indian Tribes with economic development, or requests therefor. There are other materials that suggest repudiation by defendant of the agreement to supply a 10,000 acre irrigation system since to do so would be folly because there would not be enough water to service such a system. *See, e.g.,* Pl.'s Exh. 87, App. p. 329; Pl.'s Exh. 94, App. p. 480, 481. The true tenor of the materials at hand indicates that the government intended for all residents in the Walker River vicinity to be benefitted by planned projects. The only evidence clearly referring to the obligation is a February 1972 report, apparently prepared in support of a

---

7. The court would also reject any attempt to view plaintiff's requests, assuming *arguendo* they exist, as transforming the breach into a continuing claim. *Cf. West v. ITT Continental Baking Co.,* 683 F.2d 845, 846 (4th Cir.1982). In any event, plaintiff disavows any reliance "on the doctrine of 'continuing wrong' developed under the [Act]. Plaintiff relies on conventional rules of law." (footnote omitted) (Pl.'s Reply Brief p. 11).

funding request, which notes that an improved irrigation system will complete, in part, "the true intent of an agreement, dated May 25 [*sic,* July 20] 1906." This language, in context, is as much, if not more, evidence of a recognization of a repudiated breach of the 1906 agreement as it is an affirmation of said agreement.

Still, determining plaintiff's "options" with respect to defendant's breach does not, as plaintiff seems to believe, determine the proper measure of damages for defendant's failure to construct the irrigation system, which is the crucial issue herein. Neither the *Helex* cases nor *Riess v. Murchison, supra* n. 6, stand for the proposition that damages for past wrongs are to be measured as of the time of trial, *i.e.,* when the aggrieved party seeks recompense rather than performance.

The general rule applied in the Court of Claims, this court's predecessor, seems to be that damages are to be measured at the time of breach. In *Reynolds v. United States,* 141 Ct.Cl. 211, 158 F.Supp. 719 (1958), the government wrongfully refused to exchange certain lands with plaintiff Reynolds in 1936. Reynolds sought as damages, *inter alia,* the difference in sales prices of the lands as of 1957, which seems to be the time when her complaint was heard. The court held, however, that Reynolds was only entitled, insofar as is relevant here, to the difference in sales prices as of 1936 (the time of breach), stating:

> * * * The normal measure of damages for breach of contract or other legal obligation is the difference in value between what one would have received if the obligation had been satisfied according to its terms, and what one got or had in fact. The time when performance should have taken place is the time as of which damages are measured. [*Id.* at 220, 158 F.Supp. at 725.]

Similarly, in *Estate of Berg v. United States,* 231 Ct.Cl. 466, 469, 687 F.2d 377, 380 (1982), the court held "[i]t is well established that the date of breach is the proper date for establishing [fair market value]. *See also, Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 888, 524 F.2d 707, 721 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976). Accepting plaintiff's statement in its reply brief (p. 7) that " * * * plaintiff is entitled to recover damages under the same standards as would be applied if the claim were prosecuted under the Tucker Act," it appears that damages in this case must be determined as of the time of the breach, *i.e.,* a reasonable time after 1906.

A similar rule has been applied in Indian cases. The treatise bearing the name of the eminent commentator Felix Cohen states that personal property claims premised upon mismanagement or breach of fiduciary duty are valued as of "the date on which the act or omission occurred, to the extent that such a date can be ascertained." Cohen, *supra,* at 569. In *United States v. Kiowa, Comanche and Apache Tribes,* 143 Ct.Cl. 534, 541–42, 163 F.Supp. 603, 608–09 (1958), *cert. denied,* 359 U.S. 934, 79 S.Ct. 650, 3 L.Ed.2d 636 (1959), the court accepted, without discussion, the proposition that damages for breach of an implied in fact contract (or of the obligation of fair and honorable dealings) were measured by the fair market value of the property at the time of its acquisition by the government. Finally, in *Nooksack Tribe v. United States,* 162 Ct.Cl. 712 (1963), *cert. denied,* 375 U.S. 993, 84 S.Ct. 633, 11 L.Ed.2d 479 (1964), the court held that the measure of recovery for the taking of "Indian title" was "the value of the land at the time of taking without any increment for delay in payment whether by way of interest or allowance for dollar devaluation." 162 Ct.Cl. at 718 (citation omitted).[8]

---

8. Plaintiff maintains that such holdings in these Indian cases are inapposite because the causes of action in such cases were extraordinary. Both of the above cited cases involved appeals to the Court of Claims from the Indian Claims Commission. The court, however, believes

these cases are relevant inasmuch as there is no indication that the waiver of sovereign immunity in these cases, by way of the Indian Claims Commission Act, was intended to be any less potent than the waiver of sovereign immunity in the case at bar, which is also governed by the

Although there are jurisdictions that allow for the inclusion of increased costs to the date of judgment in computing damages for breaches of construction contracts, *see, e.g., Yonan v. Oak Park Federal Savings and Loan Ass'n*, 27 Ill.App.3d 967, 326 N.E.2d 773, 780–81 (1975),[9] the court does not believe that such a principle would be available to plaintiff even if such a rule were applicable in this court. The court cannot overlook the long period of time (over 75 years) between the time of the material breach in 1906 or a reasonable time thereafter and plaintiff's present 1985–1986 claim for damages for the 1906 or thereabouts breach. The principle of mitigation surely precludes awarding present day costs under such circumstances. As indicated, *supra* pp. 641–42 plaintiff could easily have petitioned Congress, as did other Indian tribes, for a special jurisdictional act to sue defendant for its breach when it should have been obvious defendant had no intention of providing a 10,000-acre irrigation system. At the very least, plaintiff could have insisted on performance by recourse to Department of Interior channels. The Tribe, as indicated by the materials at hand, knew how to petition Congress and how to prepare Tribal Resolutions to air their concerns and rights. In this context, the court believes the following language from one of the *Helex* cases to be pertinent—

> As a general proposition, one side cannot continue after a material breach by the other * * *, act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.

*Northern Helex Co. v. United States*, 197 Ct.Cl. 118, 125–26, 455 F.2d 546, 551 (1972). *See Ling-Temco-Vought, Inc. v. United States*, 201 Ct.Cl. 135, 146–48, 475 F.2d

630, 634 (1973). *See also Losei Realty Corp. v. City of New York*, 254 N.Y. 41, 171 N.E. 899 (1930) (construction contract; plaintiff cannot unjustifiably await performance and allow damages to mount); C. McCormick, *Damages* § 169 at 650–51 (1935) (where builder abandons construction contract, owner's recovery "is the amount actually expended by the owner, if reasonable, or the amount which it will be necessary for the owner, *acting with due dispatch*, to expend in order to bring the work to completion * * *") (footnotes omitted; emphasis added). *Cf. Hurst v. Forsythe*, 584 S.W.2d 314 (Tex.Civ.App. 1979) *writ ref'd n.r.e.* (for damages to be measured other than at time of breach, suit must be brought and tried in a reasonable time).

Here, the court finds that it was unreasonable for plaintiff not to have enforced its rights much earlier than "the instant election," especially if its views on completion of the 10,000-acre irrigation system were as strong, constant and vociferous over the years as plaintiff suggests in its briefs. The materials before the court just cannot support a conclusion that plaintiff was warranted in indefinitely awaiting performance by the defendant. Indeed, plaintiff did not even file its petition with the Indian Claims Commission until more than 4 years after the Act became law in 1946. *See* 8 Cl.Ct. 477.

While it might be argued (plaintiff does not so argue) that damages should be measured as of August 13, 1946 when plaintiff apparently first became assured of a legal remedy, the court does not believe that this would be proper. Plaintiff had ample opportunity to challenge defendant's breach in a meaningful way prior to said date, and this serves to lessen the weight to be given

---

Indian Claims Commission Act. It is to be noted that plaintiff has not cited a single Indian Claims case that supports the damage theory it advances herein. This fact is not without some significance.

**9.** There is, of course, contrary authority, *see, e.g., Bachman v. Fortuna*, 145 Conn. 191, 141

A.2d 477 (1958), and the court deems it worthy of note that 22 Am.Jur.2d Damages § 52 states: "As a general rule, the damages upon breach of contract are to be measured as of the date of breach. Under this rule, fluctuations in value after breach do not affect the recovery allowed." (Footnotes omitted.)

any such argument.[10] The possibility of an award of damages measured at the time of breach with interest to the date of trial (judgment), *see, e.g., Lake Region Paradise Island v. Graviss*, 335 So.2d 341, 342 (Fla.Dist.Ct.App.1976), *cert. dismissed*, 338 So.2d 842 (Fla.1976), is likewise unavailing. Except for "taking" cases, it is clear that interest is not allowed against the United States in the absence of a specific treaty or contractual provision, or a statute. *See generally United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). There is no basis for any such damage award in this case.

Analytically, the case here is similar to those cases in which the government gave inadequate consideration in exchange for tribal lands. There, the breaches were *de jure*— the government gave all it promised, but the consideration was inadequate as a matter of law. Here, the breach was *de facto* —the government promised apparently adequate consideration, but failed to fulfill it as a matter of fact. In the *de jure* cases, there was no award of damages, *i.e.*, interest, to compensate the tribes for the government's failure to deliver the necessary consideration at the earlier time. *See, e.g., Nez Perce Tribe v. United States*, 176 Ct.Cl. 815, 829–30 (1966), *cert. denied*, 386 U.S. 984, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1967). The court is of the view that the denial here of interest or damages for increased costs is no more repugnant to the purposes of the Indian Claims Commission Act than was the denial of interest in the *de jure* cases.

In light of the foregoing, the court holds that the proper measure of damages for the first element of plaintiff's claim is the cost of constructing an irrigation system covering 10,000 acres as of the time of breach, *i.e.*, a reasonable time after 1906.[11]

## II.

Plaintiff's second element of damages seeks to recover the profits from business opportunities the irrigation system would have provided the Tribe from the time the system should have been provided until the present. As stated above, *see supra* n. 4, plaintiff has taken pains to stress that it is not seeking damages here "for loss of productivity of the unirrigated irrigable lands on the reservation." Thus, plaintiff is attempting to recover the profits it believes would have been generated by the irrigation system itself. At oral argument, plaintiff indicated that this would have been done through the use of a service charge to those individual Indians

---

10. On November 5, 1919, the Walker River Tribe submitted a petition to Congress in search of a storage dam in order to have available more water for Reservation needs. With such a dam, the Tribe advised Congress, it could irrigate nearly 7,000 more acres. It is noted that in this petition the Tribe never once mentioned the 1906 obligation of the government to construct an irrigation system for 10,000 acres. Pl.'s Exh. 88, App. pp. 451–58. Likewise, in an October 14, 1971 Resolution of the governing body of the Walker River Tribe, the Tribe noted its need for improvements in its irrigation system, which "was constructed in the early 1900's and again in the 1930's * * *." The Tribe also noted that it had "made numerous requests for irrigation improvements down through the years only to be put off year after year. * * *" Again, no mention was made of defendant's 1906 obligation to construct an irrigation system for 10,-000 acres. These instances suggest, and not unreasonably, that the Tribe viewed the material breach of the government's obligation as con-

firmed and established. The Tribe certainly was not relying on that obligation at those times.

11. The totality of the materials available to the court preponderate in favor of a finding that the irrigation system contemplated by the 1906 agreement was a network of irrigation ditches, laterals and reservoirs sufficient to irrigate 10,-000 acres of land. In clarification, the court sees a distinction between reservoir as that term was used in the materials at hand and a large dam. Additionally, the materials submitted by plaintiff give some indication of the cost of such a contemplated irrigation system which, hopefully, the parties will utilize in an effort to reach an agreement that will bring this seemingly endless litigation to a conclusion. *See* Pl.'s Exh. 82, App. pp. 228–30; Pl.'s Exh. 83, App. p. 231; Pl.'s Exh. 86, App. p. 236 *et seq.* Further, the attention of the parties is again called to the court's observations re damages in its prior opinion. *See* 8 Cl.Ct. 489 n. 16.

or others using the water supplied by said system.

Both this court and its predecessor court, the Court of Claims, have, however, viewed with cautious skepticism claims for lost profits, especially in the case of a new venture. It is not unreasonable to view the operation of a water supply system by the Indians in 1906 as a new venture, and characterize its profitable operation by the Indians thereafter as far from certain. In *Neely v. United States*, 152 Ct.Cl. 137, 146, 285 F.2d 438, 443 (1961), it was noted that lost profits were recoverable where, *inter alia*, "the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made." The court also stated, however, that "almost always, in the case of a new venture, the fact that there would have been a profit, had there not been a breach [of contract], is too shrouded in uncertainty for loss of anticipated profits to form a reasonable measure of the damages suffered." *Id.* at 146–47, 285 F.2d at 443. *See also William Green Constr. Co. v. United States*, 201 Ct.Cl. 616, 626–27, 477 F.2d 930, 936–37 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974). These views were essentially reaffirmed by the Claims Court in *L'Enfant Plaza Properties v. United States*, 3 Cl.Ct. 582 (1983), *aff'd and rem. mem.*, 746 F.2d 1490 (Fed.Cir.1984). In that case, it was observed that a new business is "generally

precluded" from realizing lost profits for a breach of lease because "its loss is too remote, contingent, and speculative." *Id.* 3 Cl.Ct. at 590.

In the instant case, the court is of the opinion that the problem of speculation is insurmountable. First, it is questionable whether the Tribe would or could have charged its allottee members for using water delivered by the system. This is especially questionable in circumstances where an allottee member sold his allotted land to a non-Indian.[12] Secondly, an estimation of the number of persons using the system, and thus the amount of use, would be based on pure conjecture.[13] Finally, there is no reasonable way to determine whether a sufficient amount of water would have been available throughout the period to permit a profitable operation of any such system. *See United States v. Walker River Irr. Dist.*, 104 F.2d 334, 339 (9th Cir. 1939) (limiting reservation's water flow right to 26.25 cubic feet per second of water, rather than the 150 cubic feet per second flow claimed and sought by the United States on behalf of the Tribe).[14] Separately and together, these factors make "a reasonable estimate of the profit" from any business opportunities that a 10,000-acre irrigation system might have presented most improbable.

### III. *Conclusion*

For all of the foregoing reasons, the court holds that plaintiff is entitled to re-

---

12. The materials at hand indicate that some allottees did sell their allotted land to non-Indians. *See* Pl.'s Exh. 99, App. p. 518.

13. In 1906, the land was allotted, in 20-acre tracts, to some 500 tribal members. As of 1931, there were 160 Indian families on the Reservation for a total number of 536 Indians. Only some 68 Indian families farmed some 1,400 acres. In 1951, 63 Indian families were farming 2,063 acres. (Pl.'s Exh. 99, App. p. 518) As of 1931, there was a probability that there were not enough Indian farmers to utilize an irrigation system for 10,000 acres. (Pl.'s Exh. 94, App. 501) *See also United States v. Walker River Irr. Dist.*, 104 F.2d 334, 340 (9th Cir.1939).

14. A December 5, 1914 exhibit (Pl.'s Exh. 83, App. p. 231) proffered by plaintiff indicates that at that time there were more irrigation ditches

than water available to utilize them. A May 29, 1915 exhibit proffered by plaintiff (Pl.'s Exh. 84, App. p. 233) suggests it was useless to make extensions to the existing irrigation system since water was unavailable to make use of such extensions. Other exhibits proffered by plaintiff (*e.g.*, Pl.'s Exh. 85, App. p. 235; Pl.'s Exh. 86, App. p. 236; Pl.'s Exh. 87, App. p. 323; Pl.'s Exh. 94, App. p. 468) speak to the uncertainty of a water supply to serve the existing irrigation system (some 1,600–1,900 acres), much less an irrigation system servicing some 10,000 acres. The failure of the Tribe relative to its claim for a water flow from the Walker River of 150 cubic feet per second severely (see the text accompanying this note) restricted the development of the irrigation system to the stage that existed in the 1930's, a fact that was appreciated while the litigation was in progress in the 1930's. *See* Pl.'s Exh. 94, App. 479–80.

cover, for breach of the government's obligation to construct an irrigation system, the cost of constructing or completing such a system as of 1906 or a reasonable period thereafter. The court suggests that the period 1906–1915 would provide a reasonable time frame for consideration by the parties of the cost estimate necessary to reflect the damages due plaintiff for defendant's breach of obligation. At oral argument, plaintiff intimated that 1915, among other dates, would not be an unreasonable boundary for the time period. Plaintiff is not entitled to recover damages in the nature of lost profits that might have flowed from lost business opportunities. The parties are directed to provide the court within sixty (60) days of the date of this opinion with a report on the amount of damages plaintiff is entitled to recover. If the parties can agree on this amount, and the court feels they should be able to do so, then the report should be submitted in stipulated form in order that a judgment on the irrigation claim may be entered by the court. Should the parties disagree on the amount of the damages, then each party shall submit a separate report indicating therein their differences, factually and legally. Further proceedings on this claim will be determined after the court reviews these reports.