**NORTHERN HELEX COMPANY**

v.

**The UNITED STATES.**

No. 454–70.

United States Court of Claims.

Oct. 22, 1975.

Clarence T. Kipps, Jr., Washington, D. C., attorney of record for plaintiff; F. V. Roach, Omaha, Neb., Ralph P. Blodgett, Jim W. Krueger, Dean W. Wallace, Edward J. Vandermark, Omaha, Neb., John Lloyd Rice and Miller & Chevalier, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, for defendant. James F. Merow, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, SKELTON, NICHOLS and KUNZIG, Judges.

## OPINION

SKELTON, Judge.

In this case Northern Helex Company (plaintiff or Northern Helex) seeks in its second amended petition to recover $99,964,000 from the Government as damages for a breach of contract to purchase helium. The plaintiff is a wholly owned subsidiary of Northern Natural Gas Company (Northern). The liability issue in the case was decided in favor of the plaintiff by this court in *Northern Helex Co. v. United States,* 455 F.2d 546, 197 Ct.Cl. 118 (1972). In that decision we held that the failure of the Government to pay for helium delivered to it by the plaintiff as required by the contract was a material breach that justified the plaintiff in terminating the contract and for which the plaintiff has a claim for damages. We held further that the plaintiff had not waived the breach of the Government by its continued production and tender of helium to the Government both before and after suit was filed. However, we did not pass upon plaintiff's claim for damages nor upon other issues in the case that will be discussed below. We granted plaintiff's motion for summary judgment on liability and remanded the case to the trial judge to determine the amount of recovery, if any. A trial was held on this issue, which resulted in findings of fact

and a recommended decision by the trial judge in favor of the plaintiff for the recovery of $78,012,142 as damages from the Government.[1] Both the plaintiff and the defendant excepted to the trial judge's report. The facts necessary for our decision are included in this opinion. Our task is to decide the issues left undecided in our prior opinion cited above. Most of the basic facts are set forth in that opinion, and, for the sake of clarity and continuity, are repeated below with certain omissions and additions.

The plaintiff, a wholly owned subsidiary of Northern Natural Gas Company, made a contract with the United States, acting through the Department of Interior, on August 15, 1961. This agreement was authorized by the Helium Act Amendments of 1960 (50 U.S.C. § 167 et seq.), a long-range program designed to conserve helium as a natural resource for future use. A by-product of the production of natural gas, helium was wasted daily as it escaped into the atmosphere at such a rate that the helium-bearing gas resources in the southwestern states were expected to be inadequate for national needs by 1980–1985. Because of the unique properties of helium and the slim likelihood of finding new sources as rich as the Hugoton Area, involved here, the helium conservation program was initiated. One of its components was plaintiff's contract.

This provided for the purchase by the United States of the helium to be produced by Northern Helex which was estimated to be 13.5 billion cubic feet over a span of years. The helium was to be extracted from Hugoton gas, delivered, and paid for each month over the 22-year contract period with an annual fiscal year limitation of $9.5 million. The unit price of $11.24 per thousand cubic feet had increased to $12.41 by the date this action was filed (in December 1970) due to automatic price adjustments envisaged by the agreement. The Govern-

[1] The findings of fact and recommended decision of Trial Judge Louis Spector have been helpful, but we reach a somewhat different result.

ment also entered into similar contracts with Cities Service Helex, National Helium Corporation, and Phillips Petroleum Company. Pursuant to its contract, Northern Helex constructed facilities, extracted, and delivered helium from December 7, 1962, onward.

The helium conservation program was intended to be self-liquidating, financed with borrowing authority provided by Congress and with funds lent by the Treasury Department to Interior. The borrowed funds were to be supplemented and, within 25 to 35 years, repaid with interest from helium sales proceeds. Interior was to sell some of the helium at a price high enough to pay for the entire program and still have 40–50 billion cubic feet in storage for use after 1983. The "federal market"—consisting of Government agencies, their prime contractors and subcontractors—was expected to purchase its major helium requirements from Interior and provide the basic financing for the whole program.

Unfortunately this forecast did not prove itself. The difficulty was that, from the mid-1960's, private helium plants began to operate outside the program and to sell to Government contractors. Also, other conservation contractors produced helium in excess of the amount which could be sold to Interior under their contracts and sold the excess in competition with Interior at lower prices. Northern Helex sold helium only to Interior, but over the period of 1965–1969, some $25 million (it is said) was lost to the program because helium was purchased for federal use from other private producers rather than the Bureau of Mines. Congress did not appropriate enough funds to satisfy the payments due under the agreements of Northern Helex and its companions in the program. By letter dated November 26, 1968, Interior informed plaintiff that the Government would be unable to make payments when they became due as of January 1969. Beginning in December 1968, and continuing through 1969 the Government failed to pay the complete amount owed. Arrearages in the month-

ly payments ranged from a low of $664,-122 to a high of $3,235,349. For deliveries from November 1969 through November 1970, the Government paid nothing at all.

In May 1970, the Interior Department convened a meeting of the four conservation contractors in which they were told that the unit price and the maximum annual payment would have to be negotiated downward. A letter of June 24, 1970 (acknowledged June 26), from Northern Helex notified the Government that its failure to make payments was a material breach which was not being waived, but that Northern Helex was willing to discuss modifications. A draft agreement which would have increased the obligations of plaintiff while the payments to it were decreased was circulated along the lines discussed in the negotiations. Meanwhile, in his request for supplemental appropriations for fiscal year 1971, the President asked only $56,100,000 in borrowing authority for obligations under the helium contracts. This amount was not sufficient to pay outstanding debts and all anticipated deliveries for the remainder of the fiscal year but only to cover five months of operation at the present contract price and seven months at the reduced price proposed by Interior. No real progress was made during the negotiations, as Northern Helex delivered 657,008,000 cubic feet of helium from November 1, 1969, through November 30, 1970, plus an additional 44,647,000 through December 24, 1970, the date of filing of the petition in this court, without receiving any payment.

In its petition, plaintiff alleged that although its contractual obligation to perform had been discharged by the Government's material breaches of contract, it would continue to tender helium to the Government in mitigation of damages and in the interest of conservation. This was done, according to Northern Helex, because helium extraction facilities have been interrelated with its liquefied petroleum gas and petrochemical op-

erations in such a way that the helium facilities must be continued in operation whether helium is wasted or stored. Northern Helex has no facilities for storage, purification, distribution, or marketing of helium and there is so little demand for the gas in the private market that the company has not considered it financially feasible to develop such facilities. On December 30, 1970, Northern Helex notified Interior of this suit and of its decision to continue to deliver helium, despite the material breach, because of the integration of its facilities and the need to save helium.

On January 14, 1971, the United States sent Northern Helex a check for $8,671,631.99—the total amount then due for all helium delivered by plaintiff— which the company cashed, without any notation on the check, and it then amended its petition to reflect payment as a reduction of damages. On January 26, 1971, the Undersecretary of Interior wrote plaintiff terminating the contract under its termination clause, effective March 28, 1971. Plaintiff does not acknowledge the legitimacy of this asserted termination. Since then, a "no prejudice agreement" has been entered into under which Interior agrees to store helium which Northern Helex has continued to deliver. Payment also continued. Northern Helex billed Interior for helium delivered through March 31, 1971. The bills carry a legend indicating that delivery, submission of documents, and payment shall be without prejudice to the rights of the parties. After the recent Congressional appropriation of funds, on June 23, 1971, Northern Helex received a check of $2,285,872.87 for the period of December 1970 through March 28, 1971. This June payment is also considered by Northern Helex to be a reduction of damages without prejudice to its rights.

The parties stipulated that had the contract remained in effect from Decem-

ber 24, 1970, through August 15, 1983, the plaintiff would have delivered 6,467,000,000 cubic feet of helium to the Government. The trial judge found that at the contract price of $12.41 per m. c. f. in effect when the contract was terminated on December 24, 1970, the Government would have paid the plaintiff the sum of $80,255,000 for such helium.

The parties stipulated further that had the contract remained in effect to the end of the contract period, plaintiff's costs in performing the contract would have amounted to the sum of $43,067,413.[2]

The plaintiff contends that it is entitled to recover as common law damages for the breach the full contract price of $80,255,000, adjusted upward according to the wholesale price index, without any reduction for its costs of operation ($43,093,793) in performing the contract. The basis for this contention is that plaintiff's helium extraction plant is a part of an integrated operation involving itself, which owns and operates the helium extraction plant, and the following additional companies and their operations: Northern Natural Gas Company (Northern), which owns the natural gas and also owns and operates a natural gas pipeline and transmission system; Northern Gas Products Company (Gas Products), which owns and operates ethane and liquefied gas products facilities; and Northern Petrochemical Company (Petrochemical), which owns and operates petrochemical facilities. Northern is the parent company and all of the other companies are its wholly owned subsidiaries. The integration relied on by the plaintiff consists of the following operations. Northern supplies the natural gas from its pipelines to the plant of Gas Products in Bushton, Kansas, which extracts propane, ethane, and heavier liquids from the gas. The helium plant of plaintiff at Bushton extracts helium and nitrogen from the gas and returns

---

**2.** Excludes consideration of potential liability for Landowners/Producers claims; excludes any adjustment for inflation (stated in 1971 dollars); and excludes interest for money borrowed or to be borrowed by plaintiff.

the gas to Northern for sale to fuel customers, while a low B.T.U. nitrogen-methane mixture is piped to Gas Products for burning the methane as fuel, and for rejection of the nitrogen by venting it into the air. Petrochemical's plant is located in Joliet, Illinois, but is connected with the Bushton, Kansas complex by a pipeline from which it receives Bushton feedstocks and especially the high purity ethane for which it was designed and on which it depends. The Petrochemical complex consists of an ethylene oxide—ethylene glycol plant, an olefins plant, and a low density polyethylene plant. The plaintiff alleges that Northern, through its wholly owned subsidiaries mentioned above, has an investment of 300 million dollars in all of these plants. These companies allegedly have interlocking agreements or understandings providing for the furnishing of services and products to each other. The plaintiff says that it cannot stop operating its helium plant because it is obligated by contract with Northern to process up to 500,000,000 cubic feet of Northern's gas per day for the extraction of helium-gas mixture for 22 years (to 1983), and because it is necessary for plaintiff's helium plant to extract a nitrogen-methane mixture from the gas so that Gas Products can reject the nitrogen and burn the methane as fuel. The contract between the plaintiff and Northern is in evidence and only requires the plaintiff to extract helium. Nitrogen extraction is not mentioned. There is no showing how or why the plaintiff is obligated to extract nitrogen for the benefit of Gas Products and Petrochemical and their operations.

■ The plaintiff contends that the pre-contract discussions by the parties about integration of helium, nitrogen removal, liquid propane gas (LPG), and petrochemical facilities show that the necessity for Northern Helex to continue operation of the helium facilities to the end of the contract period in the event of a breach (or termination) by the Government was not only reasonably foreseeable by the Government, but was expressly recognized before and during the negotiation of the contract, as well as in the terms of the contract. By reason of these facts, plaintiff claims that it is entitled to recover its cost of operation to August 15, 1983, along with its profit, which together equal the full contract price. We do not agree. Neither the facts in this case nor the law applicable thereto obligates or requires the Government to pay the costs of plaintiff's performance from the date of the breach to the end of the contract term. There was no privity of contract between the Government and Northern, or Gas Products, or Petrochemical. The Government had nothing whatsoever to do with the operations of those companies nor with their obligations with or to each other. There was no obligation on the part of the Government to remove helium and nitrogen from the gas so that Northern could have gas of pure quality to sell to fuel customers. Neither was the Government obligated to remove nitrogen from the gas so that Gas Products could reject it, nor was the Government concerned or involved in any way with the extraction of propane, ethane, LPG and other hydrocarbons from the gas by Gas Products. There was no obligation on the part of the Government to see that high purity ethane was furnished by Gas Products to Petrochemical in Joliet, Illinois. The plaintiff has shown no connection whatever between the Government and these companies and their operations.

The only contract that the Government had was with Northern Helex for the purchase of helium. No other product is mentioned in the contract. This was a fixed fee contract. The Government had no interest in nor obligation with respect to plaintiff's costs in performing the contract either before or after termination. Performance costs were the sole responsibility of the plaintiff as the seller of the helium and the Government as the buyer had no liability with respect to them.

■ The Government is even further removed from liability for the so-called

"integrated costs" of plaintiff resulting from the integrated operations of plaintiff with Northern, Gas Products and Petrochemical, because the contract between plaintiff and the Government provided:

### ARTICLE XXXI.   GENERAL

\*    \*    \*    \*    \*    \*

31.3 In connection with Seller's plant, Seller at its sole risk, cost and option may construct and operate, or cause to be constructed and operated, facilities for extracting products other than helium from the natural gas processed through said helium plant.

This clause completely exculpates and exonerates the Government from the *cost* of operation of any "facilities for extracting products other than helium from the natural gas processed through said helium plant" constructed and operated by plaintiff. The only facility constructed and operated for such purpose by plaintiff was that part of its helium extraction plant that extracted nitrogen which it furnished to Gas Products. The above clause relieves the Government of any liability for the cost of extracting nitrogen from the gas by plaintiff. None of the remaining integrated facilities for the extraction of ethane, propane, LPG, petrochemicals, etc., from the gas were constructed or operated by the plaintiff but by Northern, Gas Products, and Petrochemical with which the Government had no privity of contract. Since the above clause in the contract protects the Government from liability for the cost of operation of any such facility constructed and operated by the plaintiff, no liability can be imposed on the Government for the cost of operation of any part of the facilities constructed by plaintiff's parent and sister companies to which the Government owes no contractual obligation.   Even if the

plaintiff "caused to be constructed and operated" the plants of Northern, Gas Products, and Petrochemical, the above contract clause protects the Government from liability for their operation costs, because this contingency is covered.

The basic rule for awarding common law damages for a breach of contract is stated as follows in Restatement of Law, Contracts § 329, comment a at 504:

In awarding compensatory damages, the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract.   \*    \*    \*[3]

See also subsidiary rule section 335 [Id.]:

If the defendant's breach of contract saves expense to the plaintiff by discharging his duty of rendering a performance in return or by excusing him from the performance of a condition precedent, the amount of this saving is deducted from the damages that would otherwise be recoverable.

See also 5 Corbin, Contracts §§ 1038, 1053, 11 Williston, Contracts, § 1353, (3d ed. 1968).

The plaintiff argues that the above rule (section 329) when properly applied to the facts of this case entitles it to recover its costs for performance of the contract to the end of the contract term. The basis for this argument, as pointed out above, is that by reason of the pre-contract discussions and negotiations between the parties, it was contemplated that the plaintiff would build and operate an integrated plant that would extract nitrogen, ethane, propane, LPG, other hydrocarbons, and petrochemicals, in addition to the helium to be sold to the Government, and that the Govern-

---

**3.** The court has qualified or clarified this rule by noting that plaintiff is to be placed "in as good a position *pecuniarily* as [it] would have been if the contract had been completely performed." *J. D. Hedin Constr. Co. v. United States,* 197 Ct.Cl. 782, 803, 456 F.2d 1315, 1327–28 (1972). [Emphasis supplied.]   *G. L. Christian & Associates v. United States,* 312 F.2d 418, 160 Ct.Cl. 1, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

ment agreed to and encouraged such a plan. The plaintiff contends that by reason of these facts, the Government had sufficient reasons to foresee the harm that would result to the plaintiff if the Government breached or terminated the contract, and that this imposed an obligation on the Government to pay the cost of plaintiff's performance to the end of the contract term if the Government breached the contract. We do not agree, because the facts do not support the theory of the plaintiff, as will be shown below.

■ The facts show that Northern was planning as a commercial undertaking the integrated operation (that was finally constructed and operated) as early as 1957. At or about this time it had architects and engineers to draw up plans for such an enterprise. These were abandoned when it began negotiations with the Government. However, on October 28, 1960, Northern entered into a contract with Gas Products whereby the latter company would construct and operate a plant at Bushton, Kansas, to extract and remove various hydrocarbons from natural gas to be supplied by Northern. The contract period was 20 years. This contract was made almost a year before the contract was executed between the plaintiff and the Government on August 15, 1961. Consequently, the contract with Gas Products could not have been foreseen nor contemplated by the Government when its contract was executed with the plaintiff, because the Gas Products contract had been in force for almost a year. Furthermore, the Gas Products contract was amended on June 26, 1967, almost six years after the contract with plaintiff involved here was executed. Such amendment provided that at that time ethane was not being extracted from the gas by Gas Products, but that it was proposed to be so extracted by 1969 and be in full production by the end of 1974. These activities were to take place eight and 13 years after the contract between the plaintiff and the Government was executed on

August 15, 1961. The Government could not have foreseen that these events would occur after so long a time. It should be kept in mind that the Gas Products plant is the central part of plaintiff's alleged integrated operations. It receives the nitrogen from plaintiff's extraction plant which it rejects. It extracts ethane, propane, LPG, and other hydrocarbons from Northern's gas. Furthermore, it supplies Petrochemical with pure ethane, from which the latter company extracts the petrochemicals mentioned above. To hold the Government responsible for costs that support such operations approaches speculation which we cannot approve. As pointed out above, we do not know how or why the plaintiff is obligated to supply nitrogen to Gas Products, nor how or why Gas Products is required to supply pure ethane to Petrochemical. The Government could not possibly have foreseen these activities nor assumed any liability with reference thereto, because, among other reasons, even now the facts regarding them are unknown to the Government. There is no evidence whatever that the parties° contemplated at the time the contract was signed that the Government assumed any liability or responsibility for the alleged integrated operations, nor that the Government would be liable for the cost of plaintiff's performance in case the contract was terminated. The evidence, including the contract, point the other way and negate any such understanding or assumption. The Supreme Court said in *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 755, 47 L.Ed. 1171 (1903):

\* \* \* If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach. We have to consider therefore what the plaintiff would have been entitled to recover in that case, and *that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to sup-*

*pose that it assumed,* when the contract was made.

This point of view is taken by implication in the rule that *"a person can only be held to be responsible for such consequences as may be reasonably supposed to be in the contemplation of the parties at the time of making the contract." * * * The consequences must be contemplated at the time of the making of the contract.* [Emphasis supplied.]

Plaintiff's claim for its performance costs appears to be an afterthought that was developed by it after the breach by the Government.

Furthermore, during the pre-contract discussions, the Government did not request or require the plaintiff to exhibit its plans nor to reveal its costs, because the Government was not concerned with such facts. All the Government wanted to do was to buy helium at a fixed fee and the extent and cost of plaintiff's plant and its operation was its own business that did not concern the Government.

■ Regardless of the pre-contract discussions and negotiations between the parties, under well settled principles of contract law, for which citation is unnecessary, all such discussions and negotiations merged into the executed contract. As has been stated, the contract does not impose any obligation on the Government to pay plaintiff's costs of performing the contract to the end of the term, nor any obligation whatever to pay any costs with reference to plaintiff's integrated operations with its parent and sister companies. As stated above, the contract absolves the Government from liability for any costs of plaintiff's integrated operations. Furthermore, with reference to the alleged pre-contract discussions and negotiations, the contract provides:

### ARTICLE XXXI. GENERAL

31.2 The terms of this contract express and constitute the full agreement between the parties thereto. There are no warranties, covenants, stipulations, or conditions existing apart from the terms of this contract.

■ Accordingly, we hold that the plaintiff is not entitled to recover its costs of performance ($43,093,793) of the contract to the end of the contract period, and that its claim for the full contract price of $80,255,000, escalated, without any reduction for costs of performance is denied.

■ The defendant has alleged what it calls an affirmative defense to plaintiff's claim for damages. We declined to decide this question in our previous decision (455 F.2d 546, 197 Ct.Cl. 118), but must do so in this opinion. This affirmative defense consists of the following set of facts. Notwithstanding plaintiff's termination of the contract on December 24, 1970, because of defendant's breach for non-payment as required by the contract, the defendant treated the contract as still valid until January 26, 1971, when Under Secretary of the Interior Russell sent plaintiff a notice terminating the contract as of March 28, 1971, under paragraph XII of the contract. The plaintiff challenges both statements and says that neither condition existed. The plaintiff says furthermore that the decision to terminate was not that of the Under Secretary as required by the contract but that of the Office of Management and Budget; and that in any event the Under Secretary had not complied with the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 *et seq.*) by filing an environmental impact statement dealing with the termination; and, finally, that the contract had already been terminated by the plaintiff on December 24, 1970, by reason of defendant's breach; and that for all these reasons the attempted termination by Under Secretary Russell was ineffective. We hold that the last stated argument of the plaintiff is the correct one and that since the contract had been terminated by the plaintiff on December 24, 1970, there was nothing for the Under Secretary to terminate when he sent his

termination letter on January 26, 1971, and that his attempted termination of the contract under paragraph XII, effective March 28, 1971, was totally ineffective because he could not terminate a contract that no longer existed. We do not reach nor decide the other questions raised by the plaintiff with respect to Under Secretary Russell's attempted termination of the contract, because it is unnecessary to do so.

■ After plaintiff terminated the contract on December 24, 1970, it continued to extract helium and nitrogen from Northern's natural gas, delivering the thus purified gas to Northern for its fuel customers and nitrogen to Gas Products for rejection. Ethane was furnished to Petrochemical by Gas Products for the extraction and production of the described petrochemicals. The helium thus extracted after termination was tendered to the Government for the alleged purpose of mitigating damages, according to the plaintiff. Since the Government considered the contract still in effect until Under Secretary Russell terminated it as of March 28, 1971, the Government continued to accept and pay for the tendered helium up to that date but refused to accept any helium thereafter. On January 14, 1971, the Government paid plaintiff $8,671,631.99 for helium delivered through November 30, 1970. Thereafter, on June 18, 1971, it paid the plaintiff $2,285,872.87, which defendant stated was $232,557.68 less than plaintiff was due for helium delivered from December 1, 1970, through March 28, 1971. This difference was explained by the Government as being $32,557.68 due the Government under an interim contract 14–09–0060–3085 for storage of helium by the Government for the plaintiff from March 28 to April 30, 1971,[4] and $200,000 claimed by the Government in a counterclaim filed by the Government in

this case for the value of certain helium delivered by the plaintiff which was processed from natural gas extracted from land owned by the Government under leases from the Government to third parties.[5] The $2,285.87 included $532,431 for helium delivered from December 1, 1970, through December 25, 1970, and $1,753,442, for the period from December 25, 1970, through March 28, 1971. The Government has paid $1,786,000 to plaintiff for helium delivered subsequent to the breach, which includes the $32,557.68 mentioned above. All the helium received for the account of the Government has been paid for. The plaintiff contends that this $1,786,000 represents a part of the damages due it for the breach by the Government. The Government says it represents payment for helium received under the contract. We think both theories are wrong. The argument of the plaintiff would work against its interest because if approved, it would have to give the Government credit for the $1,786,000 on any damages it is awarded in this case. Furthermore, this payment was not one for damages and cannot be so considered. The Government's position is likewise erroneous. The payment was made after the plaintiff had terminated the contract on December 24, 1970, and consequently, it was not and could not have been a payment under the contract. We conclude with respect to this transaction that after the contract was terminated on December 24, 1970, the plaintiff offered to sell a quantity of helium to the Government at a price of $12.41 per m. c. f. and the Government accepted the offer and received and paid for it and the transaction was closed. There was a complete accord and satisfaction between the parties with reference to it. This course of dealing was separate and apart from the contract and has no effect on any issue in this case. We leave the parties where

---

4. On or about March 26, 1971, the parties entered into an interim contract for storage of helium for plaintiff by the Government without prejudice to plaintiff's rights to damages, for which storage plaintiff agreed to pay specified fees. This storage continued until September 28, 1972. The plaintiff has paid $502,545 for this storage.

5. This counterclaim has been deferred for later proceedings and is not a matter to be decided by us at this time.

we find them with respect to this sale and payment after the contract was terminated.

We now consider the interim storage issue. As stated above, the plaintiff has paid the Government the sum of $502,-545 for storage of helium for its account delivered after March 28, 1971. This payment was made in accordance with the agreement of the parties made on or about March 26, 1971. Both parties agree that the title to the stored helium is in the plaintiff and that the Government will deliver it to the plaintiff on demand. Here again we have a transaction entered into by the parties after the termination of the contract that has nothing to do with the contract itself nor any issues in this case. The parties executed the storage contract at arm's length and both have complied with its terms. The following letter from the plaintiff shows that it fully understood that the helium was being stored for it by the Government and that it was willing to pay, and did pay, the Government for such storage:

Mr. Harold W. Lipper
Chief, Division of Helium
United States Department of the Interior
Bureau of Mines
Washington, D. C. 20240

Dear Mr. Lipper:

Enclosed is our check in the amount of $195,260.88, which represents full payment of storage charges due under the Interim Storage Contract through August of 1972.

By reason of our inability to find a sufficient market for helium and the tremendous financial burden placed upon us by Interior's breach of the Helium Purchase Contract, we can not justify the storage of additional volumes of helium produced subsequent to September 28, either on a short-term or long-term basis. Thus, we are not in a position to renew the Interim Storage Contract.

We will, however, continue to pay storage charges accruing upon our he-lium remaining in storage after September 28. Although we expect to pay you at the rate specified in the Interim Storage Contract, we are hopeful that more equitable storage charges might be arranged.

You have acknowledged that the charges we have heretofore paid under the Interim Agreement cover the redelivery of our helium. Therefore, we call upon Interior to continue the redelivery of helium to Kansas Refined Helium as in the past.

In furtherance of the conservation of helium and in mitigation of the losing party's damages, we will continue tendering helium to Interior subsequent to September 28. It is understood that Interior's acceptance thereof will in no way prejudice either party's legal position.

Very truly yours,

/s/ S. F. Segnar
S. F. Segnar
President

Notwithstanding the foregoing facts, plaintiff seeks the recovery of the $502,-545 storage charges as a part of its damages. We do not agree that it is entitled to such recovery. Here again the parties entered into an interim storage contract at arm's length and both parties performed the contract according to its terms. The Government stored the helium for the plaintiff and will deliver it to the plaintiff on demand. The plaintiff has paid for the storage according to the interim contract. The transaction is complete and an accord and satisfaction has been reached between the parties. We leave them where we find them with regard to the storage issue, which has nothing to do with the main issues in the case before us. The plaintiff is not entitled to recover such storage charges.

Paragraph 7.4 of the contract in issue provided a formula to cover plaintiff's potential liability to the lessee/producers for the value of helium not sold to the defendant under either a total price or projected unearned profit theory of damages. The defendant contends that the

plaintiff would no longer have any contingent liability to the lessee/producers after either December 24, 1970, the date plaintiff terminated the contract, or March 28, 1971, the date defendant ceased to receive and pay for helium. The damage issue raised is whether the contingent liability is to be regarded as a potential cost of operation of the plaintiff or a potential profit. By a stipulation following trial, the parties deferred the resolution of this issue to later proceedings. Accordingly, we do not decide it. These claims have been the subject of other litigation. *See Northern Natural Gas Co. v. Grounds,* 441 F.2d 704, 723 (10th Cir. 1971), *cert. denied,* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267; *Ashland Oil Inc. v. Phillips Petroleum Co.,* 364 F.Supp. 6 (N.D.Okl.1973).

■ The plaintiff has continued to operate its plant and extract helium and nitrogen from natural gas from the date it terminated the contract on December 24, 1970, up to the present time, claiming that it has done so and continues to do so to mitigate defendant's damages. This mitigation claim lacks substance. The helium is vented into the air and wasted. The plaintiff admits that the helium has no market value. It is unreasonable in the extreme for the plaintiff to say that for over 4½ years it has continued to extract valueless helium from the gas and wasted it in the air solely for the purpose of mitigating defendant's damages. The rules applicable to the right of a seller to continue the manufacture and identification of goods to the contract are to be found in Sections 2–704(2) and 2–709(1)(b) of the Uniform Commercial Code. As stated by the court in its decision in *Northern Helex Co. v. United States,* 455 F.2d 546, 553, 197 Ct.Cl. 118, 129 (1972):

> \* \* \* The guiding principle is whether, in the individual circumstances, the seller exercised "reasonable commercial judgment" in continuing to manufacture and deliver, in the effort to mitigate damages, although his obligation to perform had been discharged by the buyer's total breach. \* \* \*

■ Defendant contends that since plaintiff's facility was continued in operation *solely as an accommodation and without charge* to Northern, its parent corporation, and to a sibling corporation, *i. e.,* Gas Products, *to whom plaintiff owed no contract duty and the continued operation patently was not performed in an effort to mitigate damages,* plaintiff's continued and continuing performance following breach was not an exercise of "reasonable commercial judgment" within the contemplation of the rule. *Anderson,* Uniform Commercial Code, § 2–704:5, n. 10 at 535, states that "the matter of reasonable judgment is to a large degree controlled by the concept of good faith." It is obvious that after the plaintiff terminated the contract on December 24, 1970, or after the Government quit accepting and paying for helium on March 28, 1971, or after the plaintiff quit storing helium in the Government facility on September 28, 1972, the plaintiff did not extract helium to mitigate defendant's damages but did so in order to furnish helium and nitrogen free gas to Northern and nitrogen to Gas Products. The only mitigating circumstance shown by the evidence were sales by the plaintiff after the termination of the contract and during the years from 1971 through 1976 of quantities of helium to Kansas Refined Helium for the total sum of $2,872,547. The Government is entitled to have this sum credited to any damages that may be awarded to the plaintiff against the Government in this case. The plaintiff claims expenses for transportation in connection with this sale in the sum of $477,387 and travel expense in trying to sell helium during 1971 and 1972 in the sum of $13,032. The defendant contends, and we agree, that the plaintiff did not prove that these amounts were correct, reasonable, or necessary. All the proof that plaintiff offered was its Exhibits 86E and F which were mere listings of these claimed expenses. The

plaintiff should have proven that these expenses were spent, that the amounts were correct, reasonable, and necessary, and such other facts regarding them as were relevant. *River Construction Corp.* *v. United States,* 159 Ct.Cl. 254, 271 (1962). Exhibits 86E and F show that we are not being unduly technical about these items. These exhibits are as follows:

### NORTHERN HELEX COMPANY
*Sales to Kansas Refined Helium*

| Year | Volume (Mcf) | Transportation | Revenue |
|---|---|---|---|
| 1971 | 2,351 | $ 800 | $ 22,335 |
| 1972 | 54,964 | 46,598 | 522,370 |
| 1973 | 60,000 | 105,288 | 570,000 |
| 1974 | 70,000 | 122,836 | 665,000 |
| 1975 | 80,000 | 140,384 | 760,000 |
| 1976 | 35,036 | 61,481 | 332,842 |
| Totals | 302,351 | $477,387 | $2,872,547 |

WDW: 23 March 1973

### NORTHERN HELEX COMPANY
*Travel Expenses Incurred Trying to Sell Helium*

| 1971 | $4,778.70 |
|---|---|
| 1972 | 8,253.45 |

Salary and telephone expenses unknown.

---

Exhibit 86E was prepared and filed in court in 1973, yet it shows transportation charges for the future years of 1974, 1975, and 1976. Obviously, these charges are mere estimates and have not been incurred. Exhibit 86F does not show what the travel expenses were, who incurred them nor any other relevant fact regarding them. Ordinarily, we would reject these claimed items of expense for lack of proof. However, in view of the fact that further proceedings at the trial level of this court will be required in this case, the plaintiff should be afforded an opportunity to make the proper proof of these items of expense, and if it does so, the court will consider them as valid, mitigating expense claims.

The plaintiff flatly accuses the Government of wasting helium because it will not accept plaintiff's offer to furnish the helium to the Government provided the Government pays plaintiff the full contract price for it. In this regard the plaintiff says:

* * * If defendant continues to reject the offer and causes the helium to be wasted, that is the Government's choice as long as the taxpayers permit such irresponsible action. [Pltf's Reply Brief at 81.]

This argument is unpersuasive. It is clear that the only reason the plaintiff continues to extract helium from the gas is to supply helium-free gas and nitrogen to its related companies as a part of its integrated operations. It is obvious that the plaintiff is not extracting the helium through any patriotic motivation to preserve it as a natural resource for future generations. If that were the case, it could donate the helium to the Government since it is wasting the helium anyway. After all, it is the plaintiff, and not the Government, that is wasting the helium into the atmosphere. That can hardly be said to be an irresponsible act on the part of the Government. We are not advised whether the plaintiff is wasting the helium voluntarily or is be-

ing required or forced to do so by Northern, Gas Products, Petrochemical or anyone else. If the wasting is an irresponsible action, it is not that of the Government.

▆▆▆▆ The Government cannot be excused for its breach of the contract. The plaintiff is entitled to recover common-law damages for such breach. However, it is not easy to calculate such damages in a case as complex as this one. As a seller of helium, it is not entitled to consequential damages. *Anderson,* Uniform Commercial Code, § 2–708:15. Furthermore, remote and consequential damages are not recoverable in a common-law suit for breach of contract. *See Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 543, 23 S.Ct. 754, 47 L.Ed. 1171 (1903). This is especially true in suits against the United States for the recovery of common-law damages, such as the instant case. *See Ramsey v. United States,* 101 F.Supp. 353, 121 Ct.Cl. 426 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1396 (1952); *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692, 738 (1964); *Specialty Assembling & Packing Co. v. United States,* 355 F.2d 554, 567–68, 174 Ct.Cl. 153, 175 (1966); *William Green Constr. Co. v. United States,* 477 F.2d 930, 936–37, 201 Ct.Cl. 616, 626–27 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974).

▆▆▆▆▆▆ In the *William Green Constr. Co.* case we said:

* * * And even in a common-law suit there would be no recovery for general loss of business, the claimed loss of the entire Green net worth, and losses on the non-federal work—such damages are all deemed too remote and consequential. *See Ramsey v. United States,* 101 F.Supp. 353, 357–58, 121 Ct.Cl. 426, 433–35 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952); *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692, 738 (1964); *Specialty Assembling & Packing Co. v. United States,* 355 F.2d 554, 567–68, 174 Ct.Cl. 153, 175 (1966).

In *Ramsey v. United States, supra,* we held:

Plaintiffs allege that the Government's failure to pay the money promptly was the immediate cause of the corporation's financial difficulties which resulted in a reorganization under the Bankruptcy Act. In actions for breach of contract the damages are ordinarily limited to the natural and probable consequences of the breach complained of, *and the damages remotely or consequently resulting from the breach are not allowed.* * * *

* * * * * *

The profits lost from the corporation's over-all business activities, because of its shortage of capital allegedly occasioned by the Government's failure to pay the contract amounts when due, may not be recovered either. It is important to bear in mind that the corporation's claim is not for the anticipated profits of the contracts in question, but is a claim for the anticipated profits of its entire business enterprise. *The lost profits of these collateral undertakings, which the corporation was unable to carry out, are too remote to be classified as a natural result of the Government's delay in payment.* The statement of this court in *Myerle v. United States, supra,* 33 Ct.Cl. 1, p. 26, (1897) fully disposes of this claim:

* * * But we think there is a distinction by which all questions of this sort can be easily tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. These are part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into. *But if they are such as would have been realized by the party from other independent and collateral undertakings, al-*

*though entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit. [Id., 101 F.Supp. at 357–8, 121 Ct.Cl. at 433, 434–35.]* [Emphasis supplied—Footnote omitted.]

These authorities support our denial of plaintiff's claim for the costs of the operation of its plant to the end of the contract term in connection with its nonfederal work with its related companies, because such costs are too remote, speculative, and consequential to be compensable as damages. Of course, the plaintiff is entitled to recover its pecuniary loss of anticipated and unearned profits. The difficulty comes in determining what they are and how to calculate them. One complicating factor in this case is the fact that the plaintiff constructed a plant at a cost of $11,500,000 to perform the contract and to participate in its integrated operations.[6] The plaintiff still owns and operates the plant for the benefit of its integrated processes. The plant had a value at the time of the breach, not only as a physical structure, but also for furnishing helium and nitrogen-free gas and nitrogen to its related companies. The latter value is a value that is excess to the value of the physical structure. It is possible and probable that the fair market value of the physical structure at the time of the breach was in excess of the cost ($11,500,000) of the structure when it was built, especially after the structure was depreciated at five percent per annum. These excess values are values or benefits the plaintiff has received by reason of its performance of the Government contract and which it has not expended nor exhausted, but which it still owns, possesses and uses and will continue to use in its integrated operations. These excess values, whatever they may be, must be considered in calculating plaintiff's damages.

We hold that plaintiff's damages must be determined and calculated as follows:

(1) The excess, if any, of the fair market value of the physical plant at the time of the breach over the original cost of the plant ($11,500,000) depreciated in straight line depreciation of five percent per annum should be determined. The resulting figure represents the excess value, if any, of the physical plant at the time of the breach over the original cost of the plant depreciated.

(2) The excess value of the plant at the time of the breach occasioned by its continued operation in the "integrated" process of plaintiff and its related companies as an on-going operation for the extraction of helium and nitrogen and the furnishing of helium-nitrogen-free gas and nitrogen to plaintiff's parent and sister companies should be determined. This value is separate and distinct from the excess value, if any, of the physical plant over its depreciated original cost of $11,500,000.

(3) The excess value of the physical plant, if any, over the original cost of the plant depreciated should be added to the excess value of the plant as an on-going and functioning plant that is operating and will continue to operate in plaintiff's integrated operations. The sum of these two values represents the total excess value of the plaintiff in its helium plant that has not been expended nor exhausted by the performance of the contract with the Government, but is an asset or benefit conferred on the plaintiff by its performance of the Government contract and which it owned, possessed, and used at the time of the breach and still owns, possesses, and uses and will continue to own, possess, and use in the future in its integrated operations.

(4) The sum of the excess values described in (1) and (2) above should be added to the total stipulated anticipated manufacturing costs of $43,067,413 that the plaintiff would have expended to the

6. It was estimated that had the Government built a plant for the extraction of helium, it would have cost $22,000,000.

end of the contract term. This addition results in the total anticipated costs and benefits of the plaintiff attributable to the helium contract; *i. e.,* total costs and benefits not spent by plaintiff because of the breach.

(5) The sum of the excess values of the plant and the anticipated manufacturing costs should be subtracted from the total anticipated revenues, before taxes, to the end of the contract period in the sum of $80,255,000. The resulting figure represents the anticipated profits from this contract to the plaintiff, subject to the following deductions.

(6) From the foregoing anticipated profits, the proceeds of the sale of helium to Kansas Refined Helium in the sum of $2,872,547, less any expenses properly proved up by the plaintiff as indicated above, must be subtracted, along with savings found by the trial judge of $11,000 per year to the plaintiff if it did not operate the helium plant, and any other savings to it by its nonperformance of the contract because of the breach. The resulting figure, discounted to current value as of the date of entry of final judgment, should place the plaintiff in as good a position as it would have been in had the contract been fully performed.

█ The plaintiff contends that the anticipated revenues from the contract should be escalated in accordance with the wholesale price index formula provided in Article 7.3(b) of the contract. We do not agree. In our opinion this Article would be applicable only in the event we awarded the plaintiff the full contract price as damages. Since we are awarding it only its anticipated profits as calculated above, the escalation Article is irrelevant and should not be applied after the date of the breach. After that date, the contract was terminated and of no further force and effect. There is no more reason to enforce the escalation Article than the Article dealing with damages in case of termination (Article 13). Furthermore, if anticipated profits are escalated, anticipated costs

would have to be escalated also. In that case, the profits and costs would more or less offset each other. However, the anticipated cost escalation might exceed the profit escalation and this would be detrimental to the plaintiff. We hold that the escalation Article is not applicable. Accordingly, we do not reach nor decide the controversy between the parties as to the proper years to be selected as the base period from which to predict or project the probable escalation of the wholesale price index through 1983.

█ The plaintiff contends that it should be awarded interest on its award of damages to offset the discount to current value of its award. We recently considered the question of interest in an in-depth opinion in the case of *United States v. Mescalero Apache Tribe,* 518 F.2d 1309, 207 Ct.Cl. —— (decided July 11, 1975) in which we held unequivocally that in non-condemnation cases interest cannot be awarded against the Government in the absence of a statute, treaty or contract providing for interest, and that this is true whether it is called interest, penalty, offset or damages. The instant contract does not provide for interest and we are without authority to award it. The interest claim is denied.

Judgment is entered for the plaintiff for its anticipated profits as damages for defendant's breach of contract in accordance with this opinion, and the case is remanded to the trial judge to determine such damages under Rule 131(c), and for other appropriate proceedings.

COWEN, Chief Judge (concurring):

The proceedings in this big and difficult case have reached the stage where the principal issue to be decided is the measure of damages that should be used to compensate plaintiff for the defendant's breach of contract.

The Uniform Commercial Code does not apply to this case; both parties agree that plaintiff's damages should be computed in accordance with common law principles, and the court has followed that course. Even if we were to look to the Code as a general guideline,

we would be faced with a sharp dispute between the parties as to which of its sections relate to this case. Since the Code does not apply, we need not resolve this dispute.

Whether plaintiff is entitled, as it asserts, to recover the full contract price, or whether it should be compensated in accordance with the court's formula, is a mixed question of law and fact. The answer is necessarily a conclusion to be derived in substantial part from pertinent evidence and an interpretation of certain provisions of the contract.

The principal negotiators for the contract, which was executed on August 15, 1961, were Henry P. Wheeler, Jr., Assistant Director of the Bureau of Mines, who represented the Government, and F. C. Nicholson, who began his employment with Northern Natural Gas Company in 1958, and was a vice president of Northern during the negotiations. The testimony of these men and the reports and memoranda which they wrote shed much of the light provided by the record on the issue of whether, during the negotiations, defendant contemplated that, if it breached the contract, it would be responsible for the cost of continuing the operation of the helium plant.

Taken as a whole, the testimony of Mr. Nicholson[1] shows that the Government was not interested in nor did it inquire about plaintiff's cost of constructing the helium plant, the process to be used in extracting the helium, or the physical connection or relation between the helium plant and other units to be operated by Northern and its subsidiaries. The representatives of the Government assumed that the helium plant would be integrated with other facilities at Bushton, but the probability of such integration was not mentioned by the negotiators as a part of the consideration for the contract price. The Government's main concern was to ac-

quire helium from plaintiff at less than the cost of recovering it in a plant constructed and operated by the Government. Thus, the contract price was developed on the basis of what it would cost the Government to produce helium in its own grass-roots plant—a plant independent of all other operations (Nicholson Tr. 503).

The testimony of Mr. Wheeler accords in all material respects with that of Mr. Nicholson. Mr. Wheeler stated that the contract price was negotiated, not on the basis of the cost of plaintiff's plant, but on what the cost would be if the Government constructed its own plant and removed the helium from the gas. He also testified that any references made by the representatives of Northern Helex to an integrated plant had no effect on the discussions relating to the contract price.[2]

In the operation of the helium plant, a nitrogen methane gas mixture is necessarily extracted in the process of recovering helium. In the early part of 1970, following changes in the contract between Northern and Gas Products, Northern began piping the nitrogen-methane mixture (referred to as a "high-nitrogen, low-B.t.u. stream") from the helium plant to the ethane plant. The purpose of this operation was to use the small amount of methane in the mixture as fuel and to reject or remove the nitrogen. The rejection of the nitrogen was not necessary to the physical operation of the ethane plant which could and did produce ethane without the removal of nitrogen. However, the nitrogen was removed so that the net B.t.u. value of the gas stream piped from the helium plant would not be reduced by the removal of the ethane. The gas residue was then piped into Northern's transmission lines for sale to its customers. Plaintiff's claim of entitlement to the full contract price is largely grounded on its contention that the continued extraction of ni-

---

1. Nicholson Cross Examination Tr. 477–581.  2. Wheeler Tr. 675–677.

trogen in plaintiff's helium plant is essential to the process by which the nitrogen is rejected in the ethane plant; that this was contemplated when the contract was executed, and that defendant then understood, or should have understood, that a breach of the contract would make it liable for the costs required to continue the operation of the helium plant. This contention is contrary to the following testimony given by Mr. Nicholson:

"Q * * * The helium company was not at all concerned under its contract with the Government with the production of nitrogen, was it?

"A The helium company was not at all concerned with the production of nitrogen in the negotiations with the Government for helium." (Tr. 535)

The same conclusion is reached when one considers the facts regarding the construction and operation of the several facilities of Northern and its subsidiaries at the Bushton complex. Gas Products LPG plant is a self-supporting grassroots plant which was built in 1961 to remove propane, butane, isobutane, and natural gasoline from the gas stream fed into it by Northern. The LPG plant can operate wholly independently of the helium plant. The helium plant made its first delivery to the Government on December 7, 1962. The original plans for the design and construction of the helium plant included special boilers which would burn the low B.t.u. fuel left after the removal of helium. However, the Federal Power Commission ruled that the nitrogen used in this manner would have to be valued as a fuel and costed on a volume basis. When this was found to be economically disadvantageous, plaintiff reinjected the low B.t.u. stream into the pipeline downstream from the helium facility.[3] This procedure continued until 1970, when the ethane plant began operations.

Near the end of 1966, Northern decided to begin the extraction of ethane and on July 3, 1967, filed an application with the Federal Power Commission requesting authorization for Northern to deliver additional volumes of gas to Gas Products for use in such extraction. Northern realized that the extraction of ethane would reduce the B.t.u. content of the gas stream sold to its utility customers, and in order to avoid a lengthy and complex hearing, Northern stated that nitrogen would be extracted from the additional volume of gas delivered to Gas Products to offset the B.t.u. loss. Northern also assured its utility customers and the Commission that the B.t.u. content of the gas stream which Northern had been delivering to its utility customers would not change by reason of the extraction of ethane.[4]

On June 26, 1967, about the same time the application to the Federal Power Commission was filed, the 1960 contract between Northern and Gas Products was amended to provide for the delivery by Northern of additional quantities of natural gas so that Gas Products could commence the extraction of ethane. The contract provided that in its ethane extraction process, Gas Products would not lower the B.t.u. value of the residual gas to be returned to Northern for sale to its customers.[5]

Construction of the ethane facility was begun in 1969, and the plant began operation early in 1970. Thereafter, gas leaving the LPG plant, which formerly had been piped directly to the helium plant, was piped into the ethane facility for processing prior to transmittal to the helium plant. The high-nitrogen, low B.t.u. stream remaining in plaintiff's plant after removal of the helium was then diverted to the ethane facility and used to fuel that plant's special boilers.[6] This diversion was made so that nitrogen could be removed at the ethane plant in compliance with the FPC order and

---

3. Trial judge's finding 111.
4. Trial judge's finding 116.
5. Trial judge's finding 127.
6. Trial judge's finding 111.

Northern's assurances to the FPC and its customers that the B.t.u. content of its gas stream would not be lowered by the ethane extraction.[7] As previously noted, it is not physically necessary to remove nitrogen in order to extract ethane from natural gas.

There is no provision in the contract between plaintiff and Northern, and there is no contract between plaintiff and Gas Products which states that plaintiff is obligated to remove nitrogen from natural gas.[8] Plaintiff receives no payment for that operation. The application, which Northern filed with the Federal Power Commission regarding the proposal for the extraction of ethane, made no reference to the extraction of nitrogen by the plaintiff nor was there any statement that plaintiff was so obligated in order to enable Gas Products to reject the nitrogen.

Several provisions of the contract further support the conclusion that the Government did not contemplate that, in the event it breached the contract, it would assume the obligation of continuing the extraction of nitrogen in the helium plant so that Gas Products could comply with its 1967 contract with Northern. Paragraph 1.1 of the contract provides that the term "plant" means the helium extraction plant to be constructed and owned by seller "whether completed or under construction and whether separate from or integrated with other facilities owned by Seller. * * *" This provision is another indication that the integration of plaintiff's plant with other facilities in the Northern complex was not a factor contemplated as a basis for future liability by the Government. It is an expression by the Government of a lack of concern as to whether the helium plant would be a purely independent plant or whether it would be integrated with other facilities.

I agree with Judge Skelton that the following articles absolve the Government from any liability for the cost of any operations or processes by Northern or Gas Products that may have been integrated with the helium plant: Paragraphs 31.2 and 31.3 of Article XXXI, which are quoted in the court's opinion, and Article XV, which provides that "each party will be responsible for its own acts and the results thereof."

While paragraph 31.3 of Article XXXI relates to the assumption by plaintiff of risks attributable to any additional facilities which it might construct during the term of the contract, I agree with the defendant's observation that it necessarily follows that if the Government was relieved of liability for any such facilities built by plaintiff, it was all the more freed of any liability on account of any other facilities built by Northern or others of its wholly owned subsidiaries after the contract was executed. This would include the facilities put in operation in 1970 by Gas Products to reject the nitrogen in the stream which, contrary to the procedure previously followed, is now diverted from the helium plant to Gas Products.

If, as plaintiff contends, the Government foresaw the necessity for plaintiff to continue the operation of the helium plant in order to permit the rejection of nitrogen in the ethane plant, one wonders why, during the negotiations, the Government made no inquiry about and was given no detailed information, such as a blueprint or diagram of the existing and planned facilities, or a description of the physical connections among the various plants operated or proposed to be operated by Northern and its subsidiaries at the Bushton complex. One also wonders why the Government, if it was to be bound by the contractual obligations entered into between Northern and the plaintiff and between Northern and Gas Products, did not insist that it be given copies of such contracts or proposed contracts at the time the negotiations were conducted. Northern, as sole owner of the subsidiaries, could amend its con-

---

7. Trial judge's finding 116.

8. Trial judge's finding 125.

tracts with them at any time. Realizing this, the Government did not concern itself with these intercorporate contractual arrangements, because it did not contemplate that, in any event, it would be bound by them.

In my view, the facts which have been reviewed above clearly demonstrate that the Government did not foresee the liability which plaintiff would now impose upon it. Furthermore, it would be beyond the pale of reason to find that the Government should have foreseen risks resulting from the changing pattern of processes and operations of Northern and its subsidiaries after the contract was executed. The plaintiff itself did not decide to change the design of its helium plant until a ruling of the Federal Power Commission caused it to do so and to reinject the low B.t.u. stream into the downstream pipeline.

Until December 11, 1967, when the Federal Power Commission approved Northern's application of July 3, 1967, neither plaintiff, Northern, nor Gas Products knew that Gas Products would be required to reject nitrogen in the stream received from the helium plant in order to permit Gas Products to produce ethane from the additional gas to be delivered by Northern. Since these events occurred 6 years after the contract with the Government was entered into, how could the Government possibly have foreseen an obligation to keep the helium plant in operation in order to permit the rejection of the nitrogen?

The fallacy of plaintiff's position may be illustrated by the following: Let us assume that the contract was in full force and effect for a period of 12 years or until August 15, 1973, when it was breached by the Government. Let us also assume that near the end of 1971, Northern discovers a feasible process for recovering the nitrogen extracted by plaintiff in the production of helium and utilizing the recovered nitrogen as a feed stock for the production of ammonia. Northern thereupon creates a new wholly owned subsidiary corporation, builds a plant for recovery of nitrogen, and enters into a contract with the new subsidiary for that purpose. Then, for the second time after the contract with the Government was executed, a change is made in the diversion of the high-nitrogen, low B.t.u. stream from the helium plant, and the stream is now piped to the new nitrogen plant. After the contract is breached by the Government, plaintiff takes the position that the helium plant is now fully integrated with the new plant for the production of nitrogen; that the Government should have predicted and therefore should have foreseen these developments, and that it is now obligated to pay the full contract price in order that the helium plant may enable the nitrogen plant to carry out this newly integrated operation. Obviously, such a claim would be devoid of merit. In my opinion, plaintiff's claim for the full contract price is also without merit.

NICHOLS, Judge (concurring in part, dissenting in part):

I agree with much of the court's opinion, but dissent as to the vital matter of how we should treat the estimated projection of cost of performance of $43,067,413, as stipulated. The trial judge would not deduct this from the estimated contract revenues, nor would I. The court disagrees.

By UCC § 2–709, if the buyer wrongfully refuses to pay the purchase price, and the seller cannot sell the goods elsewhere, the buyer remains liable for the price. By UCC § 2–708(1) and (2), the buyer is entitled to a credit for expenses saved the seller by the breach if, but only if, this measure is adequate to put the seller in as good a position as performance would have done. UCC does not directly govern here, but the above rules do not differ materially from those acknowledged by the court to apply at common law. So far as I can tell, we differ as to issues of fact, more than law.

If I contracted with Swift & Co. to buy all the squeal produced by its pigs, and if I reneged, I would not expect

Swift & Co. to stop slaughtering pigs. I would, therefore, under the UCC, expect that Swift & Co. would go on slaughtering pigs, and any mitigating cost savings I could show would have to take that into account and probably would be slight indeed. Yet the court here, in an analogous situation, demands that the group with which plaintiff is affiliated, and with which it has integrated its operations, should stop producing natural gas. Because it does not do this, the court refuses to put plaintiff in as good a position as it would have been in upon full performance.

The record herein shows without contradiction that the Government always foresaw, and in a sense required, that plaintiff would integrate into a commercial natural gas production. Only thus could the cost be brought below the cost of a non-integrated operation. Absent such integration, and the cost savings to be expected therefrom, the Government would have preferred to produce helium in its own plants. To pretend that, under the contract, nothing but purchase of helium was involved, is to substitute a sterile legalism for the broad remedial relief the law prescribes against an unexcused contract breach.

The court puts on its blinders so as to be able to say it is putting the plaintiff in as good a position as it would have been in upon full performance, the stand it gives lip service to and should follow in reality. The court knows from the record that the three-stage refrigeration process at plaintiff's plant produces, at the third stage, about 295° F. and colder, a gas mixture, 72% helium and 27% nitrogen, which the Government bought, and a liquid residue, 26% methane, 73% nitrogen, and 0.01% helium, which is good only for fuel in special low-B.t.u. boilers which exhaust this helium and nitrogen into the air. Plaintiff could not produce salable helium without producing these, too, and they, with the methane and the purified natural gas, are the usable products of plaintiff's plant now that the Government no longer will buy the helium. Stoppage of this plant would disrupt the other elements of the integrated system and apparently, cause a larger loss than the stipulated cost, $43,067,413, incurred by keeping open.

The Chief Judge's able concurrence became available only after I had written the above, and requires further specificity by me. I rely primarily on the trial judge's findings 26 and 79. Defendant did not except to these findings except in particulars not here relevant. It desired additions rather than deletions. They show that defendant elected to contract with plaintiff to obtain a reasonable cost to the Government, because the investment in the plant and operating costs "could be spread over several other end-products rather than helium alone", and would "avoid the necessity for the Government to undertake nitrogen removal and possibly petrochemical operations as a necessary, but basically unrelated, adjunct to helium conservation." Presumably this necessity of embarking in petrochemical operations in the suppositious Government plant was to spread the costs as a private, integrated plant would do. In the March 30–31, 1961, negotiations, plaintiff advised that the helium plant to be built would be "fully integrated" with the Bushton liquids recovery plant, and that "petrochemical facilities might be constructed and added in the future." Mr. Wheeler, government negotiator, "recognized that the helium extraction facilities would, in most cases, be fully integrated with other facilities of the contractor."

Finding 125, following a description of the integration achieved after the contract date, reads in part: "All of these integrated operations are in implementation of Northern's original plans as executed through wholly owned subsidiaries." Defendant does not deny that this is true, in its exceptions, but says only it is irrelevant because the Government contract was not with Northern, i. e., it is irrelevant because of the legal theory urged in Judge Skelton's opinion.

In view of this I do not see how it can be said that the defendant could not have foreseen in general the measures

adopted by plaintiff in 1970, as the Chief Judge describes them. Defendant's officials did not know exactly what plaintiff was going to do, but they expected plaintiff to exploit to the full all the capabilities of its helium plant. They could hardly have believed plaintiff would continue its pre-1970 procedure of feeding back into the pipeline downstream from the plant the useless and detrimental nitrogen it had gone to so much trouble and expense to extract. When plaintiff stopped doing this, had it done otherwise something else than what it actually did, that something else likely would have knit the helium plant into the other plants in a way that would have been costly to unravel. If it is true that before 1970, plaintiff could have stopped producing helium without damage to the other operations, this is because the integration in that period was incomplete.

The question is one of the inferences to be drawn from the record. Our trier of fact drew his inferences, and we are rejecting them, I believe, without respect for the presumption of correctness demanded by Rule 147(b). It seems to me that the implication of this rule is that we do not disregard numbered findings, but if we think the record does not support them, we take them up individually and show why. The Government did not in 1961 actually address itself to what the damage consequences of a breach would be. Finding 125 shows that a plan for integrated operation existed, substantially the plan actually implemented before the breach. Defendant knew the helium plant would be made part of an integrated operation which might include new petrochemical facilities. (Findings 26 and 79.) If the Government did not obtain the details, the fault was its own. However, it did not do this because it did not anticipate it was going to breach the contract. Therefore, it is chargeable with what it could have learned. The Chief Judge's argument seems to imply that a party to a contract who fails to inquire or consider what the consequences of a future breach by it will be, thereby limits its liability for damages in the event it actually commits such a breach. I do not think this is the law.

I do not get any help from Article XXXI, para. 31.3, quoted by the court. It is ambiguous whether the "risk" referred to is the risk of unexcused breach by the Government. The "legislative history" of the clause shows that the parties had entirely different kinds of risks in mind. American courts do not favor contract clauses to exculpate a party from the legal consequences of his own wrong. *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), deals with this policy. See especially the fn. in Mr. Justice Douglas's dissent at p. 24, 92 S.Ct. 1907. Thus the clause here involved should be construed not to apply to the risk that a party might wilfully breach the contract.

I would be willing to give credit for the excess in the value of the plant over cost less depreciation at the time of the breach, if the court means just after it. However, in that event any deficiency in the fair market value, should also be charged to the Government. Presumably such deficiency, if it exists, is caused by the breach.